[No. B065304. Second Dist., Div. Seven. July 22, 1993.]

LOS ANGELES EQUESTRIAN CENTER, INC., et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

## Counsel

Cappello, Foley & Bezek, A. Barry Cappello, Frances E. Komoroske and James L. Hudgens for Plaintiffs and Appellants.

James K. Hahn, City Attorney, John F. Haggerty, Assistant City Attorney, and Marcia Haber Kamine, Deputy City Attorney, for Defendants and Respondents.

## Opinion

**LILLIE, P. J.**—Plaintiffs appeal from summary judgment in favor of defendants on plaintiffs' complaint for $200 million damages alleging various contract and tort theories.[1] The underlying dispute arises out of a concession agreement with the City of Los Angeles for operation of an equestrian facility on City-owned land in Griffith Park. In 1988, plaintiffs lost their interest in the concession agreement after LAEC, ECA, and Polo

---

[1] Plaintiffs (collectively referred to herein as LAEC) are Los Angeles Equestrian Center, Inc. (LAEC), a Delaware corporation, Equestrian Centers of America, Inc. (ECA), a California corporation, Los Angeles Polo Club, Inc. (Polo Club), a California corporation, and the following entities or individuals who are shareholders or creditors of the plaintiff corporations: George T. Turpin; Polly Turpin; George C. Hixon; Estate of Hugh K. Foster by Barbara Foster, executrix; Barbara Foster; and J. Albert Garcia.

Defendants are City of Los Angeles, Department of Recreation and Parks, Board of Commissioners for the Department of Recreation and Parks, James Hadaway, individually and as general manager of the Department of Recreation and Parks, and the Board of Referred Powers. Unless otherwise specified, defendants are collectively referred to as City.

Club filed for voluntary chapter 11 bankruptcy, City refused to approve the bankruptcy reorganization plan, and Gibraltar Savings and Loan Association foreclosed and assumed operation of the equestrian facility.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are gleaned from those parts of City's separate statement of undisputed facts which are undisputed by plaintiffs, and from evidence submitted by plaintiffs in opposition to the motion for summary judgment; our summary of the facts after plaintiff corporations filed for protection under chapter 11 of the bankruptcy laws in 1984 is obtained primarily from plaintiff corporations' second amended joint and consolidated plan of reorganization and joint disclosure statement filed with the bankruptcy court.

In 1976, City and Better Built Enterprises entered into concession agreement No. 183 for the development and operation of the Los Angeles Equestrian Center, located on 72 acres of land owned by City in Griffith Park. Under the agreement, the concessionaire was granted the exclusive right to maintain and operate the boarding facilities for horses for a term of 25 years; the concessionaire agreed to pay rental of 4 percent of gross receipts from boarding, 4 percent of gross receipts from rentals, and 4 percent of gross receipts from retail sales, with a minimum annual rental of $12,000 in the event the above payments total less than $12,000. The concessionaire agreed to undertake certain improvements, including a horse boarding facility for 200 box stalls and 4 riding rings. Upon termination of the agreement, all permanent improvements were to become the property of City.

The agreement required City approval prior to performing certain activities, including erecting improvements, transferring title to permanent improvements, subleasing or assigning any interest, and changing the hours of operations and prices charged to the public.

The agreement also provided that at the conclusion of the fifth year under the agreement, and every five years thereafter, "City will perform a detailed analysis of the performance and financial status of the concession. If it appears at that time that any of the terms of the Agreement require change due to changing economic conditions, etc., City will meet with concessionaire to renegotiate rental or other provisions of the Agreement. If both parties agree to change any of the conditions of the Agreement, an amendment will be prepared for approval by City, the City Attorney . . . and the City Council."

In 1977, Better Built Enterprises transferred its concession rights to Ride-A-Way Corporation, which in 1981, transferred its rights to Griffith Park Equestrian Center (Center), a California limited partnership.[2] In 1981 and 1983 respectively, City and Center entered into a first and then a second amendment to the concession agreement. According to the first amendment to the concession agreement, Center found "the remaining 19 years of the agreement term to be insufficient for obtaining long term financing to complete the project [development and operation of an equestrian center in Griffith Park]," and City was "desirous of perpetuating the established momentum of project development . . . ." The parties agreed to extend the initial term of the agreement for five years with two additional five-year terms and to change the monthly rental rate to 5 percent of gross receipts for the first five years of operation (through December 26, 1986), which rental would be "adjusted upward by a percentage equal to 50% of the total cumulative Los Angeles/Long Beach Consumer Price Index," with a required annual guarantee of $30,000.

Construction on the equestrian center, including boarding and training facilities, show grounds, indoor arena, and commercial buildings, began in late 1981 and was completed in mid-1982, with the hope that the Center would host part of the equestrian events at the 1984 Olympic Games held in Los Angeles. In addition to the costs of expedited construction, plaintiffs invested heavily in the start-up costs of presenting major show jumping events to qualify the facility for the 1984 Olympics; in 1982, ECA and LAEC negotiated a $10 million loan with Gibraltar Savings to consolidate construction loans and to obtain financing to complete improvements already in progress at the Center. Gibraltar allegedly withheld $2 million until the completion of certain improvements and attainment of a certain occupancy level and net operating income; not all of the planned improvements were able to be completed, resulting in significant operating losses. In addition, the failure to participate in any of the equestrian Olympic activities contributed to the Center's problems.

In a second amendment to the concession agreement, dated June 2, 1983, City consented "to the estate created by the Concession Agreement being

---

[2] The general partner in Center was Equestrian Centers of America, Inc., a Delaware corporation; this corporation was at some time acquired by Lumberman's Acceptance Corporation, a California corporation, and its name was changed to Equestrian Centers of America, Inc., a California corporation (ECA), which is one of the plaintiffs herein. Two wholly owned subsidiaries of ECA are plaintiffs Los Angeles Equestrian Center, Inc. (LAEC) and Los Angeles Polo Club, Inc. The parties did not dispute the fact that LAEC is the same entity as ECA with a new name. Since 1980, plaintiff J. Albert Garcia (Garcia) was president, chairman of the board and chief executive officer of ECA.

encumbered by a note and Deed of Trust in favor of Gibraltar Savings and Loan Association and, if necessary, to the conveyance of said estate by judicial foreclosure or trustee's sale." The amendment also stated in pertinent part that "In the event Concessionaire shall be adjudicated a bankrupt or become involved in any proceedings under bankruptcy laws of the United States, or if the leasehold interest created hereby or any improvements executed pursuant to this lease shall be transferred by operation of law, . . . the trustee in bankruptcy, receiver, assignee or judgment purchaser shall be bound by all provisions of this lease including but not limited to the provision that operation of the premises be operated as an equestrian center to provide services to the public."

In January 1984, Garcia requested, and the City granted, permission for the Center to sell 300 stalls and lease them back, as part of a program to refinance the horse stalls; however, the Center was required to keep 275 stalls available for rental by the public. Apparently no stalls were sold under this plan. By the fall of 1984, the corporate plaintiffs were seriously in default with respect to the Gibraltar loan and were encountering difficulty in covering the regular expenses of operation of the Center.

In September 1984, the corporate plaintiffs filed voluntary petitions under chapter 11 of the Bankruptcy Code. Reports prepared by a public accounting firm in 1985 and 1986 on the financial and operational management of the Center recommended that the Center reduce the rental rate paid to the City, provide additional revenue-producing facilities, and add a freeway access off-ramp for direct access to the Center.

After filing the bankruptcy petitions, the Center remained operational; LAEC paid only the minimum rent to City of $2,500 per month. By 1988, LAEC owed the City about $650,000 in prepetition and postpetition rent.

In 1986, LAEC negotiated with a developer and potential funding agency to develop and operate a $15 million health center/sports club complex under a sublease and build a freeway off-ramp to be amortized out of future rents to the City. In August 1986, the board of recreation and park commissioners negotiated and conditionally approved amendments to the concession agreement to accommodate the proposed health center and freeway off-ramp. Board approval for the health center project was conditional upon LAEC's payment to City of all postpetition rent owed by July 1987; as LAEC did not pay such rent, the approval of the amendments was null and void. Subsequently, the funding agency withdrew from the arrangement and the health center project was not presented to City for approval.

On April 13, 1988, the corporate plaintiffs' second amended joint and consolidated plan of reorganization came before the City's board of referred powers, acting for the recreation and park commissioners. According to the reorganization plan, City's claims against the plaintiffs under the concession agreement were classified as "Class 4," and were identified as "impaired," because the plan called for the City to receive $300,000 in partial satisfaction of its claim for $619,081 in rent pursuant to the concession agreement, and an executed promissory note for the balance still due and owing on its claim. The reorganization plan also called for, among other items, a modification of the concession agreement and execution of a new concession agreement to approve the sublease of a portion of the Center for the development of an equestrian lodge and conference center, an arena theme restaurant and entertainment facilities, and an equine veterinary hospital.

In a report to the board of referred powers by defendant James Hadaway, general manager of the department of recreation and parks, Hadaway noted that as one of LAEC's creditors, the City has a right to vote on the plan of reorganization as to whether the City will accept or reject such payment as proposed in the plan. Hadaway's report also stated that in connection with its reorganization plan, LAEC "has negotiated and received a conditional loan commitment of $12,300,000 from Trafalgar Capital Corporation, to be used to pay off the $9,000,000 Gibraltar debt. . . . Trafalgar's commitment, however, is subject to a number of conditions including Board and Council approval of a 200-room equestrian lodge and conference center, horse stall condominiums, theme restaurant and covered arena, equine veterinary hospital, and certain amendments (including renegotiated rents) to the concession agreement . . . ."

As to the proposed equestrian lodge and conference center, Hadaway's report stated that the reorganization plan "proposes the sublease of 5.0 acres of the concession premises for an equestrian lodge and conference center to be developed and operated by the Marriott Corporation. . . . LAEC has orally withdrawn its proposal for the lodge, but is still asking for approval of the conference center to be used as headquarter facilities for a press club. However no preliminary plans or written descriptions for the conference center have been submitted to the Department for evaluation. . . . [¶] . . . While the lodge and conference center may be desirable to the concessionaires as an additional source of revenues and a convenience to some of the contestants and event officials, they are far from essential to the attendance and use of the equestrian center and they are questionable uses of park property. . . . In order to maintain the integrity of the Center, equestrian activities and facilities must be considered first priority."

With respect to the plan for refinancing the horse stalls, which Hadaway characterized as the creation of condominiums and which plaintiffs maintain should be characterized as a long-term lease, the report stated that LAEC proposes to sell 300 individual horse stalls currently available for public boarding; however, "the ownership of a stall could not extend beyond the term of the concession agreement regardless of the date of purchase, which would have a diminishing effect on the value of the stall as the term of the concession agreement approaches expiration. . . . [¶] In response to certain concerns which have been expressed concerning the City's liability under the Securities laws LAEC has attempted to tailor this proposal to avoid the sale of stalls as securities, and to meet such requirements as to be real estate transactions. The proposal does not, however, satisfy the Department's concerns with respect to the applicability of the Subdivision Map Act, privatization of public park property, possible displacement of current boarders or viability of the restructured operation. The Department believes it is not in the public's interest to privatize stalls currently offered to the public at large, by selling them to private parties who may or may not choose to rent them to the public."

With respect to the theme restaurant, the report noted that as a substitute for the previously approved health center, LAEC is proposing the development of a theme restaurant and entertainment facilities. The first phase would "include an approximately 70,000 square feet medieval dinner theater/arena with 1500 seats . . . . The second phase would include a Medieval Village with cultural and educational booths, exhibitions, etc., depicting the historical evolution of the horse from Medieval Times to the introduction and development of the horse in our own country. The entire development would require approximately 20 acres of the concession premises including the additional parking area."

Hadaway also stated in his report that he had visited the Medieval Times restaurant and entertainment arena in Buena Park and had found it to be a high-quality and apparently successful entertainment center. "However, it is an entertainment center and not an equestrian center. . . . The public is not invited to ride and compete and actively participate in the equestrian activities."

The report concludes that the previously negotiated amendments to the concession agreement are not applicable to the new proposals "as no consideration was given to any of the proposals currently being submitted by the concessionaires. No consideration was given to a theme restaurant, village, theme arena, condominiumization, veterinary hospital, etc. In addition, the

current concession agreement document is over 10 years old and in need of general updating to conform to the evolved current standards of the City. The Department therefore recommends renegotiation of the terms of the agreement for approval by the Board of Recreation and Park Commissioners at any point where an amendment to the lease is otherwise required."

The report also offered several reasons why the board of referred powers should reject LAEC's second amended joint and consolidated plan of reorganization and the projects therein: (1) "As a condition of concession agreement amendments negotiated in 1986, LAEC agreed to pay to the City all back rent by July, 1987, and pay in full all rent owed thereafter; but has not done so. Therefore, the Department is somewhat skeptical as to ability of LAEC to pay the remaining $350,000 of rent owed [which under the reorganization plan, was to be paid over a five-year period]"; (2) "As an administrative creditor, the City is legally entitled to receive all post petition rent due upon confirmation of LAEC's plan of reorganization (approximately $560,000). The City should exercise its legal rights to require payment of the full amount while the court is in control of the disbursements"; (3) "As the caretakers of open park land and providers of recreation facilities, the Department cannot in good conscience recommend privatization of horse stalls or the removal of 20 acres of open space for the development of an entertainment center and 1000 paved parking spaces. Nor can the Department in good conscience recommend any further financial support to a company that has incurred losses of $27,000,000 over a period of eight years."

After public hearing on April 13, 1988, the board of referred powers voted to approve the report of the department of recreation and parks prepared by Hadaway, effectively rejecting plaintiffs' reorganization plan. On April 15, Gibraltar foreclosed and assumed operation of the Center.

Plaintiffs filed a 10-count first amended complaint against City asserting several tort and contract causes of action. All of the claims arise out of the same foregoing facts, but plaintiffs characterize the alleged wrongs under different legal theories. Defendants answered the complaint, asserting several affirmative defenses, and moved for summary judgment or in the alternative for summary adjudication of 12 issues. A more detailed discussion of each cause of action, defenses thereto, and the grounds of the summary judgment motion will be undertaken in our discussion to follow.

In granting the motion for summary judgment, the trial court stated in pertinent part that "Whether or not a joint venture and fiduciary duty existed

is irrelevant as plaintiffs' failure to comply with the contractual provisions is a waiver of the cause of action for breach of implied joint venture, breach of fiduciary duty, breach of written contract, and breach of the implied covenant of good faith and fair dealing. [¶] According to the concession agreement, in the event that the City defaults in the performance of any of the terms and conditions of the agreement, the concessionaire . . . shall give the City written notice by registered mail, the City shall have 30 days within which to cure, and then the concessionaire can terminate the agreement and recover any and all claims. . . . [¶] Plaintiffs don't dispute that they failed to notify the City. . . . [¶] The claim for inverse condemnation is unsupported by the facts. The City was a secured creditor in the bankruptcy action as the holder of the concession agreement. By refusing to approve the plan of reorganization, the City received back from the bankruptcy court its own leasehold interest of the secured creditor. Plaintiffs did not lose anything. [¶] It does not appear that plaintiffs have suffered a loss of due process. An action under 42 USC section 1983 requires that a person acting under authority of any state subjects or causes anyone to be subjected to deprivation of property without due process. [¶] The property interest here is the concession agreement and the improvements made to the Equestrian Center. Plaintiffs claim an expectation that the City would approve the plan or reorganization. Plaintiffs assert that the delays associated with the approval process and the City's rejection of the plan led to the foreclosure on the property by Gibraltar. Plaintiffs had no legitimate interest in the concession agreement by virtue of the change of ownership without City approval by written amendment to the agreement. [¶] In addition, the concession agreement continued under Gibraltar following foreclosure. The City as a creditor had a right to reject the plan. [¶] Accordingly, I'm going to grant the motion for summary judgment."

Plaintiffs filed timely notice of appeal from the summary judgment. Their two principal contentions on appeal are that the trial court erred in concluding that they had no legitimate property interest in the concession agreement and that numerous disputes of fact existed as to the issue of their alleged waiver of their claims by failure to comply with the notice requirement of the concession agreement.

I

STANDARD OF REVIEW

Summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor; where

as here, the moving parties were defendants, they must either negate a necessary element of the plaintiffs' case or state a complete defense. (*Preis v. American Indemnity Co.* (1990) 220 Cal.App.3d 752, 757 [269 Cal.Rptr. 617].) A defendant's motion for summary judgment addresses the legal question whether there are undisputed material facts which foreclose the plaintiffs' right to relief. (*Panattoni v. Superior Court* (1988) 203 Cal.App.3d 1092, 1094 [250 Cal.Rptr. 390].) Such a motion necessarily includes a test of the sufficiency of the complaint. (*Blanch v. Young* (1984) 152 Cal.App.3d 1016, 1019 [200 Cal.Rptr. 9].)

■ An appellate court reviewing a summary judgment determines upon a de novo examination whether there was no genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. (*Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1555 [8 Cal.Rptr.2d 552].) "Also, being able to identify particular flaws in the lower court's reasoning has no value because . . . summary judgment must be upheld if correct on any ground—regardless of wrong 'reasons' which may have guided the court." (*Biljac Associates v. First Interstate Bank* (1990) 218 Cal.App.3d 1410, 1419 [267 Cal.Rptr. 819].) Moreover, an appellant's failure to discuss a theory of liability on appeal constitutes abandonment of that theory. (*Id.* at p. 1420.) With the above principles in mind, we discuss the summary judgment motion as to each cause of action.

## II

### First Through Fifth Causes of Action

Plaintiffs' first cause of action is captioned "breach of implied-in-fact joint venture" and alleges that "an implied in fact joint venture relation arose between the parties by virtue of their joint undertaking to develop and operate a Los Angeles area equestrian center," the City "providing the land for equine use and plaintiffs contributing the capital and services to build and operate the Center in conjunction with the City." Plaintiffs allege that defendants breached the joint venture with plaintiffs "by first unequivocally authorizing plaintiffs to proceed with their horse-stall re-finance program and leading them to detrimentally rely on that approval and to increase their risks in the venture through continued operations and investments for more than four years and then reversing this authorization. As a result, the City used this reversed position as the basis for denying plaintiffs' reorganization plan and appropriating plaintiffs' property rights, and investment in the Center to public use without compensation therefor."

The second cause of action, captioned "Breach of Fiduciary Duties and Special Relationship—Constructive Fraud," alleges that defendants had a

duty to approve the reorganization plan by virtue of the alleged "co-venturer" relationship and by virtue of prior approval of a horse stall refinance program. The third cause of action for breach of written contract alleges that defendants breached the concession agreement by disclosing plaintiffs' confidential financial information during the course of public meetings and by retracting approval for horse-stall condominium refinance program and by unreasonably withholding consent to and denying the reorganization plan.

The foregoing allegations also form the basis of the fourth cause of action captioned "contractual breach of the implied covenant of good faith and fair dealing" and the fifth cause of action captioned "estoppel," which we interpret as asserting the theory of promissory estoppel.

Defendants' answer with respect to the foregoing causes of action asserted the affirmative defense that the pleading failed to allege sufficient facts to constitute a cause of action. As to the first cause of action, defendants asserted that any implied contract is barred by City Charter sections 385 and 386; as to the second, third, and fourth causes of actions, defendants asserted that they did not owe plaintiffs any duty to approve the reorganization plan since no special relationship existed.

One argument advanced in defendants' motion for summary judgment was that "Nothing in the Concession Agreement required the City to approve the plan of reorganization," and as a matter of law "there has been no breach of the contract." Although appellants interpret the oral statements of the trial court in granting the motion as based upon a theory sounding in lack of privity of contract or lack of standing, an issue which they address in their opening brief, it is clear to us that the trial court found no breach of contract or breach of an implied covenant because the City had no obligation to approve the reorganization plan. ■ As we explain more fully below, we conclude that the trial court properly granted summary judgment as to the third and fourth causes of action.

■ Where no extrinsic evidence bears upon the interpretation of an instrument, its construction becomes a matter of law determinable in a summary judgment proceeding. (*Lombardo* v. *Santa Monica Young Men's Christian Assn.* (1985) 169 Cal.App.3d 529, 539-540 [215 Cal.Rptr. 224].) ■ It is clear from the language of the concession agreement that the concessionaire was granted the right to construct and operate certain facilities specifically described in the contract, including boarding facilities, horse rental service, and "Any other structures, facilities, or services, except as

noted below, necessary for the successful operation of an Equestrian Center as requested by Concessionaire and approved by the Board of Recreation and Park Commissioners."

The new construction and facilities proposed in the reorganization plan were found by Hadaway and the board of referred powers not to be within the scope of the previously granted concession. There is nothing in the concession agreement or its amendments obligating City to negotiate a modification of, or amendment to, the concession contract or to negotiate a new concession contract involving new and different facilities and services, such as a medieval theme restaurant and entertainment arena. The reorganization plan itself evidences an understanding by appellants that they needed to apply to the City for approval of the new plan. Accordingly, under the facts of this case, there is no dispute that whatever approvals were granted earlier could not possibly apply to the proposal set out in the reorganization plan and there was thus no "retraction" or reversal of prior approvals or negotiated amendments to the concession agreement. The City simply rejected an entirely new project set out in the reorganization plan. Thus, the refusal to approve the reorganization plan did not constitute a breach of contract.

The third cause of action also predicates breach of the concession agreement on an alleged disclosure by defendants of plaintiffs' confidential financial information during the course of public meetings. According to the agreement, "All information obtained in connection with City's inspections of records or audits shall be received and maintained in confidence and shall not be disclosed to anyone not directly connected with the official business of City." The deposition testimony submitted by the plaintiffs in opposition to the motion for summary judgment reveals that plaintiffs themselves supplied the alleged confidential financial information pertaining to the reorganization plan to the City, which information was separate and apart from any disclosure statements filed in the bankruptcy court. Plaintiffs admitted in deposition testimony that the alleged confidential information was *not* obtained as a result of any audit or inspection of records by City. Accordingly, there is no dispute that there was no breach of contract with respect to the disclosure of alleged confidential information.

The complaint also alleges that defendants breached the contract "by precipitating and encouraging foreclosure by Gibraltar upon plaintiffs' substantial property interests . . . ." The undisputed evidence shows that City was not involved in any negotiations or contracts with Gibraltar with respect to its right to foreclose, which was the subject of agreements between

Gibraltar and appellants. In fact, the June 1983 second amendment to the concession agreement provides in pertinent part that "City consents to the estate created by the Concession Agreement being encumbered by a note and Deed of Trust in favor of Gibraltar Savings and Loan Association and, if necessary, to the conveyance of said estate by judicial foreclosure or trustee's sale." Our record thus shows that City did not breach any provision of the concession agreement or amendments pertaining to Gibraltar's right to foreclose. We conclude that summary judgment was properly granted as to the claim for breach of contract.

We reach the same result as to the fourth cause of action for contractual breach of the implied covenant of good faith and fair dealing. ■ "The implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation. [Citation.] 'The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose.' . . . 'In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.' . . . [¶] If there exists a contractual relationship between the parties, as was the case here, the implied covenant is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated in the contract." (*Racine & Laramie, Ltd.* v. *Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1031-1032 [14 Cal.Rptr.2d 335], original italics.)

■ There is no express contractual obligation in the concession agreement or amendments thereto to negotiate a modification of the type of concession granted by the contract. In rejecting the reorganization plan, the City was simply rejecting a proposed new or different type of concession than the one that had been granted previously. Pertinent here is the language in *Racine & Laramie, Ltd.*: "Absent the existence of such special circumstances or conditions, however, there is no obligation in California to bargain for a new or amended contract in good faith. None of the enumerated special circumstances existed in this case. The fact that bargaining took place over a period of many years and that the parties reached tentative agreement from time to time on some of the points at issue does not detract from this conclusion. There was in this case simply no contractual basis upon which to extract implied conditions of good faith bargaining." (11 Cal.App.4th at p. 1035.) The trial court properly granted summary judgment as to the fourth cause of action.

The first and second causes of action are predicated on the foregoing alleged wrongful acts, but characterized respectively as breach of an implied-in-fact joint venture and breach of fiduciary duties. For the foregoing reasons, it was shown to be without dispute that these claims are without merit. Whether characterized as a concession agreement or a joint venture, there was simply no breach of any duty.

█ As to the fifth cause of action for promissory estoppel, the first amended complaint alleged that plaintiffs relied upon City's prior approvals in 1984 and continued to operate the Center from 1984 through 1988, incurring huge debts in doing so; despite these approvals, City "reversed their prior approvals and rejected the horse-stall refinance program, and in so doing the reorganization plan, while specifically aware that such actions would precipitate foreclosure and wipe out plaintiffs' investments exceeding over $25 million."

█ "Promissory estoppel is described as: ' "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." ' " (*Racine & Laramie, Ltd.* v. *Department of Parks & Recreation, supra,* 11 Cal.App.4th at p. 1034.) █ The instant facts do not support such theory. It is undisputed on our record that the prior approvals pertained to entirely different projects or issues than those presented by the reorganization plan. It is not alleged that in 1984 the City made any promises with respect to any future concessions or projects, and there is no evidence on our record that any of the debt incurred by appellants after 1984 was induced by any conduct or prior approvals of the City. It was undisputed that in 1984, Garcia approached the City and requested permission from the City to sell stalls and lease them back; City gave its permission; apparently no such sales took place, and shortly thereafter LAEC filed for bankruptcy protection. The facts herein simply do not show any basis for the application of promissory or equitable estoppel. Summary judgment was properly granted as to the fifth cause of action.

We also note that in support of its motion for summary judgment, City cited the case of *Lundeen Coatings Corp.* v. *Department of Water & Power* (1991) 232 Cal.App.3d 816 [283 Cal.Rptr. 551] for the proposition that as a general rule a city may not be estopped by the conduct of its officers or employees. (*Id.* at p. 830.) This general rule provides additional support for the summary judgment to the extent that the claim is based on letters and other conduct of City employees in 1984. █ The court in *Lundeen,*

however, also states, "As a general rule, a public entity cannot be sued on an implied-in-law or quasi-contract theory, because such a theory is based on quantum meruit or restitution considerations which are outweighed by the need to protect and limit a public entity's contractual obligations." (*Id.* at p. 831, fn. 9.) The latter rule also supports summary judgment as to the first, second, and fifth causes of action. As further explained in *Lundeen*, "[T]he Charter for the City of Los Angeles requires, at section 385, that '[e]very contract involving an expenditure of more than five hundred dollars ($500) shall, except in cases of urgent necessity, as provided in Section 386 of this Charter, be made in writing, the draft whereof shall be approved by the board, officer or employee authorized to make same . . . .' " (232 Cal.App.3d at p. 831.)

## III

### Sixth, Seventh, and Eighth Causes of Action

 The sixth cause of action for intentional interference with prospective economic advantage, the seventh cause of action for negligent interference with economic relationships and the eighth cause of action for intentional interference with business relations are all predicated on the same underlying factual background discussed above. To the extent that these claims are simply restatements of the contract claims, summary judgment was properly granted for the reasons discussed above. In other words, the conduct of City in rejecting the reorganization plan was not wrongful, under either contract or tort principles.

In the trial court and in their reply brief, respondents argue that to the extent that the sixth, seventh, and eighth causes of action are based on alleged misrepresentations by City staff which interfered with appellants' financial interests, Government Code section 818.8 grants the City immunity for such acts. "[M]isrepresentation as a tort distinct from the general milieu of negligent and intentional wrongs, applies to interferences with financial or economic interest. The Legislature designed section 818.8 to exempt the governmental entity from this type of liability. [Citation.] Immunity will prevail where the governmental misrepresentation interfered with either a commercial or a financial interest. [Citation.] This is true even if the misinformation relied upon is gratuitously disseminated or the allegations of the complaint are couched in terms of code violations by the government

entity and not misrepresentations per se." (*Lundeen Coatings Corp.* v. *Department of Water & Power, supra,* 232 Cal.App.3d at p. 832, internal quotation marks omitted.)

 Appellants fail to specifically address these causes of action in their opening or reply brief, despite the fact that respondents discuss these theories of liability in their brief. Accordingly, the summary judgment on these causes of action also can be upheld on the principle that appellants' failure to discuss the theories on appeal constitutes an abandonment. (*Biljac Associates* v. *First Interstate Bank, supra,* 218 Cal.App.3d at p. 1420.)

IV

## Ninth and Tenth Causes of Action

 The trial court correctly granted summary judgment on the ninth cause of action for inverse condemnation on the ground that it was unsupported by the facts. The facts establish without dispute that appellants' plan of reorganization contemplated new projects not encompassed within the prior concession grant. Appellants simply had no contractual or other property right to develop a medieval theme restaurant and related facilities on City park property and City did not breach any duty owed to appellants by rejecting the reorganization plan calling for such development. "In order to state a cause of action for inverse condemnation, there must be an invasion or an appropriation of some valuable property right which the landowner possesses and the invasion or appropriation must directly and specially affect the landowner to his injury." (*Selby Realty Co.* v. *Buenaventura* (1973) 10 Cal.3d 110, 119-120 [109 Cal.Rptr. 799, 514 P.2d 111].) The facts herein do not establish the City invaded or appropriated any property right of appellants.

The tenth cause of action for violation of 42 United States Code, section 1983, is predicated upon the same conduct set out above, which the plaintiffs claimed deprived them of their property and contract rights in the Center and their "future benefits under the Concession Agreement and leasehold." For the reasons set out above with respect to all of the other causes of action, we conclude that there was no such unlawful deprivation. The trial court properly granted summary judgment as to the 10th cause of action.

### DISPOSITION

The judgment is affirmed. Respondents are entitled to their costs on appeal.

Johnson, J., and Woods (Fred), J., concurred.