43 F.3d 1478
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
DONICKER CORPORATION, Plaintiff-Appellee,
v.
PITTSBURGH NATIONAL BANK, Defendant-Appellant.
 No. 91-16936.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 15, 1993.
Decided Nov. 9, 1994.
 
 Before: FAIRCHILD,* BEEZER and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 OVERVIEW
 I. Factual and Procedural Background
 
 2
 This appeal arises from a construction project of an apartment complex in Guam to be known as "Iberia Apartments." Donicker Corporation, the developer, financed this project by borrowing the proceeds of bonds issued by the Guam Economic Development Authority ("GEDA"). John Holbrook was the principal stockholder and executive of Donicker. Pittsburgh National Bank ("PNB") was the Trustee of the bond issue, responsible for making disbursements of the bond proceeds under the terms of a Loan Agreement with Donicker and related loan documents.
 
 
 3
 The Loan Agreement was signed in February, 1987, and dated as of February 1. Donicker had signed a contract with Lu Island Development, Inc. ("Lu Island") and C.A.S. International Dev., Inc. ("C.A.S.") for construction of Iberia Apartments. The two latter corporations were referred to as a "joint venture," but C.A.S. later withdrew, leaving Lu Island as the building contractor. The contract sum was to be $1,958,000, and called for a 6% mobilization fee of $117,480, apparently payable before the beginning of work. Other installments were due upon completion of specified percentages. PNB refused to pay the mobilization fee in response to Donicker's requisition initially because the contractors failed to furnish a performance bond, and later, additionally, because Donicker and Lu Island failed to provide written assurance as to a completion date and that disputes between them had been resolved.
 
 
 4
 Lu Island began work in the spring or summer of 1987 and stopped on October 30, 1987, at least in part because it had not received payment of the mobilization fee. The project was 15% completed, and Lu Island filed a lien for $293,700. In November, 1988, PNB accelerated the loan and on May 1, 1989, PNB called the bonds for redemption. Because of the disbursements which had been made and because some of the bond proceeds had been used to make interest payments, there was a shortfall.
 
 
 5
 In 1988, Donicker brought an action in the Superior Court of Guam, naming Lu Island, The People's Insurance Company of China ("PICC"), the bondsman, and PNB as defendants. PNB counterclaimed against Donicker. Donicker settled with Lu Island and PICC. Donicker's claims against PNB for breach of the Loan Agreement, and of an implied covenant of good faith and fair dealing were tried without a jury. The Superior Court found breaches by PNB and entered judgment October 24, 1990, in favor of Donicker for $453,700. The award included $293,700, the amount of the lien against Donicker, as damages resulting from its failure to pay the mobilization fee, and $160,000 for failure to perform a supplemental agreement, which we shall address separately.
 
 
 6
 PNB appealed to the Appellate Division of the United States District Court for Guam, pursuant to 48 U.S.C. Sec. 1424-3(a), (b). That court affirmed and PNB appealed to this court pursuant to 48 U.S.C. Sec. 1424-3(c).
 
 
 7
 By way of background, GEDA had originally contemplated borrowings totalling $289,505,000, and was prepared to issue bonds in that amount in 1985. It entered into an Indenture as of October 1, 1985, for that purpose with PNB as Trustee. Various difficulties had been encountered and some of the individuals involved (none connected with PNB or Donicker) became the subjects of criminal prosecution. The bonds involved in this case, $3,085,000, a portion of the original total, were "remarketed" to investors. Two other projects were similarly financed and completed.
 
 
 8
 PNB continued to be the Trustee. Matthews & Wright was the Remarketing Agent, or underwriter, and Puller Mortgage Associates, Inc. the "mortgage servicer." Nothing in the record suggests that either of these was in any relevant sense the agent of PNB. The Pittsburgh law firm of Berkman, Ruslander, Pohl, Lieber & Engel was bond counsel, and Dean Richardson of that firm was active in the Donicker transaction. "Bond Counsel" was defined, in part, in the Loan Agreement as being "of nationally recognized standing in matters pertaining to the tax-exempt nature of interest on bonds issued by states and their political subdivisions...." In practice, PNB seems to have considered Mr. Richardson as a representative of the bondholders. Mr. Holbrook testified that bond counsel is supposed to represent the bondholders. Tr. I, at 21. Mr. Richardson prepared the Loan Agreement and other documents, and participated in the transaction which the parties refer to as the "closing." Donicker was represented by counsel, Mr. Untalan. Mr. Richardson worked with Mr. Untalan preparing for the closing which was held in Mr. Untalan's office in Guam, with Mr. Holbrook of Donicker, in early February, 1987. Mr. Richardson gave instructions to PNB from time to time concerning the making or withholding of disbursements and corresponded from time to time with Donicker as to what was needed from it. The Superior Court found that PNB followed Mr. Richardson's instructions regarding disbursements without question. The court did not, however, find that Mr. Richardson was an agent of PNB. Mr. Richardson's firm was bond counsel. He drafted the documents and arranged the closing of the loan with Donicker's attorney. He evidently felt that his role included instructions and advice to the Trustee in protecting the interests of the bondholders. The court believed that the definition of bond counsel in the Loan Agreement limited his role to "opinions as to whether a disbursement was a financeable project cost." If his role was so limited (which we doubt), his going beyond it added nothing to Donicker's claim. Donicker's claim against the Trustee could only be that the Trustee did not pay Donicker when Donicker was entitled to payment. If it was improvident for the Trustee to accept Mr. Richardson's directions without making its own determinations, that would be an issue between the bondholders and PNB, and would not be a basis for a liability of PNB to Donicker. Mr. Untalan continued to act as counsel for Donicker. He did not testify.
 
 
 9
 The Loan Agreement was signed by GEDA as the Issuer of the Bonds, PNB as Trustee, and Donicker as the Company. Donicker's liability was limited. The preamble stated that repayment was "to be evidenced by a nonrecourse promissory note," and Section 4.1(e) contained Donicker's agreement "to be liable therefore pursuant to the terms and conditions of the Company Note...." The note provided that Donicker's personal liability shall be limited to the property conveyed by the Mortgage and the rents, profits, issues, products and proceeds thereof. There was an exception for Donicker's obligation to indemnify the Issuer (or Trustee) in accordance with the so-called Regulatory Agreement, which "remains a recourse obligation...." Donicker had a leasehold interest in the Iberia site.
 
 
 10
 In any event, PNB's counsel testified that these were limited obligation bonds: "the bondholder is told that the only source of revenue available to repay that bond is the revenue generated from the project that's built with the proceeds." Tr. VI, at 7.
 
 
 11
 It was contemplated that interest at 9% would accrue from February 24, 1987, and would be paid to the bondholders semi-annually beginning May 1, 1987. Interest from February 24, 1987, to February, 1988, was treated as capitalized interest and was to be paid out of loan proceeds. Donicker was to make interest payments beginning March 1, 1988. This would seem to imply completion of Iberia Apartments before that date, although another provision referred to completion by November 1, 1988. There was a Reserve Fund of $288,756, which could have been called on for payments not made by Donicker. Until completion of the project and for some additional period, until rentals provided a sufficient amount, it would be necessary to pay interest and any required principal installments out of the bond proceeds themselves, and interest derived from investing them. The Indenture required the Trustee to allocate the bond proceeds to separate funds, the Bond Fund, the Reserve Fund, and the Construction Fund.
 
 
 12
 The Loan Agreement did not create a schedule for disbursements to Donicker. Article IV set forth conditions precedent to disbursement. Section 4.2 stated that the Issuer agreed to lend the bond proceeds, and that the "Loan shall be made by causing the Trustee to disburse to the Company a portion of the Bond proceeds held in the Construction Fund." Section 5.02B of the Indenture sets out the requirements for requisitions against the Construction Fund. It seems fair to say that under the Loan Agreement, when conditions precedent to disbursement set out in Section 4.1(b) and (c) of the Loan Agreement have been fulfilled, presentation of a requisition conforming to requirements triggers an obligation on the part of the Trustee to disburse the requested amount of proceeds.
 
 
 13
 At or shortly after closing, Donicker signed a requisition. It called for payment of $258,634 to Mr. Untalan's Trust Account, as well as five other disbursements. Out of the money to be paid to Mr. Untalan, $117,480 was to be paid to C.A.S. and Lu Island for mobilization costs. Bond counsel directed PNB to disburse all the amounts except the $117,480 "which we will direct you to disburse at a later date...." Feb. 27, 1987 Letter. This disbursement of $117,480 was never made. The other disbursements requisitioned were for items which the parties have referred to as closing or financing costs, including land acquisition, architect/engineering fees, title insurance premium, bond counsel fees and expenses, fee of Puller Mortgage, remarketing fee of Matthews & Wright, and a preliminary examination fee. These were paid in the amount of $253,532, as found by the Superior Court. Another payment brought the total to $264,933.50. There is no dispute but that Donicker was obligated to pay these amounts out of loan proceeds.
 
 
 14
 One of the conditions precedent to the first disbursement was that the Trustee shall have received documents of twenty-three specified types, including a "100% Payment and Performance Bond with duel [sic] obligee rider issued by a company satisfactory to the Trustee, naming the Trustee as an obligee and covering the full amount of the General Contract." Section 4.1(b)(xvi). No such bond had been issued at the time of Donicker's first requisition. PICC issued a performance bond May 7, 1987. PNB insisted on receiving the original bond. At Donicker's direction, the original was delivered to Matthews & Wright in Guam July 15, 1987, but, though demanded, it was never received by PNB. The record shows no reason why Matthews & Wright did not deliver the bond to PNB. In July, 1987, the Trustee became aware of controversy between Lu Island and Donicker about changes in construction needed because of adverse soil conditions discovered at the Iberia Apartments site, and responsibility for additional costs, and about Donicker's dissatisfaction with Lu Island's delays and ability to perform.
 
 
 15
 Through Mr. Richardson, PNB informed Donicker that the mobilization fee would not be released until Donicker and Lu Island signed a letter confirming that (1) final plans and specifications had been approved by both parties and the architect; (2) construction would commence upon receipt of the mobilization costs and would be completed by a date to be inserted; and (3) no further negotiations were required in order for each to complete their obligations under the contract. (The construction contract contained no date for commencement or completion, although in a separate letter of intent, dated February 9, 1987, the president of Lu Island said that construction time should not exceed one year.)
 
 
 16
 The requested letter was never supplied. PNB did not pay the money for the mobilization fee, and on October 30, 1987, Lu Island stopped work. Lu Island had performed about 15% of the required work and filed a lien on the property amounting to $293,700.
 
 II. The Mobilization Fee Claim
 
 17
 We focus on two aspects of this claim: A, was it a breach of the Loan Agreement for PNB to refuse to disburse the mobilization fee claim until it received the original performance bond? B, aside from A, was it a breach to refuse payment of the mobilization fee until the requested assurance letter was received?
 
 A.
 
 18
 Section 4.1(b) of the Loan Agreement provided:
 
 
 19
 Except to the extent waived in writing by the Trustee, prior to or simultaneously with the first disbursement of the proceeds of the Company Loan, the Trustee shall have received all of the following in form, content, substance and legal effect satisfactory to the Trustee in all respects.
 
 
 20
 There followed a list of twenty-three types of documents or evidence. These ranged from formal matters such as copies of the Company's articles of incorporation and bylaws (ii), to evidence of payment of taxes on the site (xix), and included a title policy or binder (iii) and a final cost breakdown (xii). One item, executed loan documents (xviii), must have been in Richardson's possession after the closing. Some of them, final plans and specifications (v), survey (xi), soil engineer's report (xiv), and evidence of permits and approvals (xv), had been placed with Puller, who had been expected to serve as mortgage servicer, but who later withdrew and refused to turn the materials over to PNB. Item (xvi) was the Performance Bond. It was not in existence at the time of closing and no original was ever delivered to PNB. Delivery to Matthews & Wright was not delivery to PNB.
 
 
 21
 Donicker included the mobilization fee in its first requisition. Bond counsel sent the requisition to PNB instructing PNB to disburse all items except the mobilization fee "which we will direct you to disburse at a later date." Feb. 27, 1987 Letter. PNB did not disburse the mobilization fee.
 
 
 22
 Mr. Holbrook testified that at closing there was a discussion about the fact that there was no performance bond, and Lu Island had said it would be in place shortly. Mr. Richardson testified that he had told Mr. Holbrook and his counsel that the mobilization payment would not be made until the performance bond was received and that the original would be needed. Mr. Holbrook testified that Mr. Richardson did not indicate that lack of the performance bond was going to cause a problem. The trial court did not make a finding resolving this conflict. At any rate, Mr. Holbrook and his counsel became aware of the problem and advised Lu Island that the performance bond would be necessary to obtain payment.
 
 
 23
 The Superior Court focused on PNB's disbursement of the $253,532 closing costs, its first disbursement, without having received the documents and evidence listed in Section 4.1(b) of the Loan Agreement. Although the court found that PNB had relied on Mr. Richardson's instructions and was not aware until July, 1987, that it did not have any of the 4.1(b) items in its possession, the court concluded that by making the closing costs disbursement it had waived its right to withhold payments until the items had been received. The court also concluded erroneously, we think, that Section 4.1(b) was for the protection of Donicker as well as the bondholders, and concluded that PNB breached the Loan Agreement by making its first disbursement without having received the items.
 
 
 24
 With respect to waiver, PNB argues that Section 4.1(b) requires any waiver to be in writing, and thus prevents a finding of implied waiver. We disagree.
 
 
 25
 A party waives its right "by his acts or conduct which naturally and justifiably led the other party to believe that he has waived the right." 30 Cal.Juris.3d, Estoppel and Waiver Sec. 24; see Howard J. White, Inc. v. Varian Assoc., 178 Cal.App.2d 348, 355, 2 Cal.Rptr. 871, 875 (Cal.Ct.App.1960) (appellant's conduct impliedly waived contract provision requiring written change orders). Implied waiver is an equitable doctrine not based in contract. Therefore, PNB could, by its conduct, impliedly waive its right to withhold the first disbursement until it received the Section 4.1(b) documents, notwithstanding the written provision to the contrary. It must have waived its right to withhold the $264,933.05 which it had disbursed. How much farther did its waiver extend?
 
 
 26
 An implied waiver must be proved by clear and convincing evidence. Brookview Condominium Owners' Ass'n v. Heltzer Enterprises-Brookview, 218 Cal.App.3d 502, 513, 267 Cal.Rptr. 76, 83 (Cal.Ct.App.1990); City of Ukiah v. Fones, 64 Cal.2d 104, 107-08, 410 P.2d 369, 371, 48 Cal.Rptr. 865, 867 (Cal.1966). To find waiver, a party's conduct must be " 'so inconsistent with the intent to enforce the right in question as to induce a reasonable belief that such right has been relinquished.' " Howard J. White, Inc. v. Varian Assoc., 178 Cal.App.2d at 355, 2 Cal.Rptr. at 875 (citations omitted); 30 Cal.Jur.3d, Estoppel & Waiver, Secs. 22 & 24.
 
 
 27
 The Superior Court found that PNB did not know until July that it did not have the documents in its possession. This gives some difficulty in upholding a finding of implied waiver, unless Mr. Richardson's knowledge is imputed to PNB. One proposition, however, is very clear. PNB consistently withheld disbursement of the mobilization fee (which would have been paid to Lu Island) because Lu Island had failed to obtain a performance bond. At least as to PNB's rights to withhold payment until it received the performance bond the finding of waiver was clearly erroneous.
 
 
 28
 The court's finding that PNB breached the Loan Agreement in making disbursement of the closing costs without having received all the Section 4.1(b) documents, including the performance bond, was also clearly erroneous. It was based on a faulty interpretation of Section 4.1(b) as creating a duty to Donicker not to disburse any money until all the documents were in PNB's possession. Donicker had requisitioned the payments which were made, as well as that which was not made. Section 5.02B of the Indenture (to which Donicker was not a party) provided that no payment of any proceeds shall be made until the conditions of Section 4.1 of the Loan Agreement have been met. PNB seems to have violated that provision in making the first disbursements, and if its reliance on Mr. Richardson's directions was improvident, that involves its duty as Trustee to the bondholders. We think it clear, however, that under proper interpretation of the Loan Agreement, the receipt of the Section 4.1(b) documents was a condition precedent to Donicker's right to disbursement, and PNB's disbursement to Donicker at Donicker's request when the condition had not been fulfilled did not breach a duty PNB owed Donicker.
 
 
 29
 PNB did not waive its right to withhold disbursement until it received the original performance bond, and nothing in the Loan Agreement created a duty to pay the mobilization fee because it had paid the closing costs.
 
 
 30
 Delivery of the original performance bond to Matthews & Wright was not delivery to PNB. The Appellate Division seems to have thought that because the Loan Agreement did not specify that PNB was to receive the original of the performance bond, PNB was not entitled to the original. We do not agree. The agreement required that the Trustee have received a "Performance Bond with duel [sic] obligee rider ... naming the Trustee as an obligee...." Section 4.1(b)(xvi). In our view, this means an originally executed document, and if a copy was intended to be sufficient, the agreement would have said "a copy."
 
 
 31
 Because no original Performance Bond[1] was ever received by PNB, it did not breach the agreement by non-payment of the mobilization fee. That could end this branch of the case, but we go on to consider another reason why PNB refused to pay the money during the summer and fall of 1987.
 
 B.
 
 32
 The second aspect of the Mobilization Fee Claim is whether, assuming a satisfactory Performance Bond had been supplied, was it a breach for PNB to refuse disbursement until PNB received the letter of assurance it had requested?
 
 
 33
 On July 24, 1987, Mr. Richardson requested a letter to be signed by Donicker and Lu Island and approved by the architect. In the letter, the signers would confirm the following:
 
 
 34
 (1) the final plans and specifications have been approved; (2) construction will commence immediately upon receipt of the mobilization fee and will be completed by a date to be inserted in the letter; and (3) there are no further negotiations required in order for each of the signers to complete their obligations in accordance with the Contract.
 
 
 35
 By this time it had become apparent that there were serious disputes between Donicker and Lu Island. Soil conditions at the site had required changes in plans and additional costs, with estimates varying from $145,000 to $261,000. Lu Island believed there must be an adjustment in the contract price to cover these costs. Donicker disputed their existence. The construction contract contained no dates for commencement or completion of the work, although Lu Island had estimated completion would take one year. Donicker was obligated to begin paying interest on the loan on March 1, 1988 ($23,137.50 per month). Mr. Holbrook asserted that delays in beginning the work and slow progress were the fault of Lu Island, and he proposed a completion date of April 1, 1988. Lu Island considered that unreasonable and indicated it would complete in September, 1988. Either date, or some date between, would have complied with the Loan Agreement. The more significant fact was their failure to agree on an adjustment for the increased cost. Mr. Wong of Lu Island testified there were three reasons for walking off the job October 30, 1987: no mobilization fee payment, no agreement for an increase in the construction price, and no agreement on a completion date.
 
 
 36
 Although the record does not show in detail the allocation of bond proceeds among the funds required by the Indenture, nor the exact amount of the construction fund, PNB's counsel testified that there were no proceeds available to pay an increase in cost (Tr. IX, at 15 and Tr. VI, at 54) and described the concern
 
 
 37
 that if the contract price was being increased and we did not have enough money in the construction fund to pay for the increase, if we would start paying contract requisitions, we would end up with a half built project or a three-quarters built project, or really, a project that would not produce revenues to pay off he debt. So we would have no monies left under the trust indenture, plus we would not have a project that ... that was producing revenues. So that was very significant to us that there was a contract dispute over the construction price.
 
 
 38
 Tr. VI, at 50-51. The record does tell us that there was an allocation for capitalized interest which ran out March 1, 1988, when Donicker was obligated to begin paying interest monthly, and there was a Reserve Fund of $288,756, out of which the Trustee was to make delinquent payments. $250,000 was for appliances, air conditioners, carpets and blinds. So-called closing costs amounted to $264,933.50. After deducting those amounts from the principal amount of the loan, approximately $2,000,000 would be left for construction.
 
 
 39
 Faced with the disputes over the completion date, and more particularly, over the increase in contract price, we think that PNB's concern and its request for assurance that no further negotiations were required was quite reasonable under the circumstances.
 
 
 40
 Section 4.1(c) of the Loan Agreement lists eleven conditions precedent to each disbursement of the Loan by PNB. These conditions include:
 
 
 41
 (ii) The Company shall have initiated significant work and made substantial progress on the Project; and there shall be sufficient time in the opinion of the Trustee's inspector to complete the Project not later than November 1, 1988.
 
 
 42
 * * *
 
 
 43
 * * *
 
 
 44
 (v) The Trustee's inspector and the Architect shall have certified to the Trustee that all construction work which has been completed is in full conformity with the Plans and Specifications and that the progress of construction is such that construction is reasonably expected to be completed by November 1, 1988.
 
 
 45
 * * *
 
 
 46
 * * *
 
 
 47
 (viii) The sum of the funds requisitioned, plus all prior disbursements, plus the aggregate of all retentions and undisbursed funds under the Company Loan shall be sufficient, in the reasonable discretion of the Trustee's inspector, to complete the Project in accordance with the Plans and Specifications.
 
 
 48
 PNB contends that these provisions gave it authority to withhold payment until it could reasonably expect that the construction would be completed, with the funds available, by November 1, 1988.
 
 
 49
 The Superior Court and the Appellate Division relied to some extent on the theory that PNB's refusal to disburse funds violated an implied covenant of good faith and fair dealing.
 
 
 50
 " 'Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.' " Carma Developers, Inc. v. Marathon Dev. Cal., Inc., 2 Cal.4th 342, 371, 826 P.2d 710, 726, 6 Cal.Rptr.2d 467, 483 (Cal.1992) (quoting Restatement (Second) of Contracts Sec. 205). This implied covenant of good faith and fair dealing requires that " 'neither party will do anything which will injure the right of the other to receive the benefits of the agreement.' " Foley v. Interactive Data Corp., 47 Cal.3d 654, 684, 765 P.2d 373, 389, 254 Cal.Rptr. 211, 228 (Cal.1988) (in banc) (citations omitted); Kendall v. Ernest Pestana, Inc., 40 Cal.3d 488, 500, 709 P.2d 837, 844, 220 Cal.Rptr. 818, 825 (1985) (in banc). It is especially important when one party to a contract "is invested with a discretionary power affecting the rights of another." Carma, 2 Cal.4th at 371, 826 P.2d at 726, 6 Cal.Rptr.2d at 483.[2]
 
 
 51
 If a contract's express provisions permit certain acts, performing those acts does not breach the implied covenant. Carma, 2 Cal.4th at 374, 826 P.2d at 728, 6 Cal.Rptr. at 485. Additionally, the covenant " 'cannot be extended to create obligations not contemplated in the contract.' " Los Angeles Equestrian Center, Inc. v. Los Angeles, 17 Cal.App.4th 432, 447, 21 Cal.Rptr.2d 313, 323 (Cal.Ct.App.1993). PNB did not have an affirmative duty to settle disputes for Donicker under the terms of the Loan Agreement. True, PNB did have a number of options, and perhaps the path it took irritated, rather than facilitated, the tension between Donicker and Lu Island. However, its chosen course--to withhold the mobilization fee--was not a breach of the Loan Agreement. For us to read into the agreement an implied duty to mediate disputes between the developer and the contractor, we would have to override an express contractual term that allowed for PNB to withhold payment until the conditions listed in Section 4.1(c) had been satisfied. And, as discussed above, PNB did not waive its right to the performance bond before it released the mobilization payment.
 
 
 52
 The provisions just quoted called for determinations by the Trustee's inspector. PNB had not employed an inspector (which would have ultimately resulted in an expense chargeable to Donicker). The Appellate Division concluded that PNB had, by failing to hire an inspector, waived its right to withhold payment under these provisions. We disagree in significant part.
 
 
 53
 PNB was willing to accept an assurance letter, certainly less expensive and onerous than a certification by an inspector. It may be that an inspector might have given an opinion pursuant to (ii) that there was sufficient time for completion since Lu Island evidently thought there was still time. An inspector and the Architect could not have certified in conformity with (v) until the final plans and specifications had been approved and even then we think would not have done so until Donicker and Lu Island had agreed how the additional cost would be borne. Quite clearly an inspector would be unwilling to make the representation pursuant to (viii) until there was agreement concerning the source of funds for the additional cost. Under the circumstances, we conclude that PNB could properly regard the letter of assurance as a proxy for the certifications under Section 4.1(c)(v) and (viii) and a condition precedent to its duty to disburse.
 
 
 54
 PNB had also received numerous reports from architects who had been employed by Matthews & Wright indicating that there were disputes over foundation changes that "may delay field work," and increased the contract price, that there were additional delays due to failure to obtain needed permits, that Donicker had not provided these architects with contract drawings and specifications, and that they had been refused access to the site.
 
 
 55
 The Superior Court enumerated options which PNB could have, but did not, pursue:
 
 
 56
 (1) Demand Donicker to provide funds to cover the increased cost [4.1(a)(iv) of the Loan Agreement]; (2) Request the parties to arbitrate the cost increase pursuant to the construction contract; (3) Exercise the Contractor's Agreement to Complete (PNB's Exhibit D1-TAB9) in which Lu Island agreed in the event Donicker failed to make any payments to Lu Island that upon written request from PNB it would complete the project without 'requiring payment from the Trustee'; (4) PNB could have sent an agent to Guam or hired mortgage servicer to negotiate settlement of the cost issue using its payment power as a moderating lever. In light of the options open to PNB and the fact that the cost increase was only seven percent (7%) of the contract price, this Court concludes that its uncompromising failure to make the mobilization fee payment was unreasonable and not in good faith.
 
 
 57
 Mar. 16, 1990 Decision p 25. The court's reference to 7% was based on a $145,000 estimate of the cost due to the change in the foundation design, far less than the higher amounts contended for by Lu Island.
 
 
 58
 PNB might have taken any one of these steps. Nothing in the Loan Agreement imposed on it a duty to Donicker to try any of these methods. Donicker, for its part, might have offered assurance that it could and would provide funds to cover the cost increase, but it did not do so. Our own examination of the record convinces us that the finding that PNB acted unreasonably and not in good faith was clearly erroneous. In concluding here and elsewhere that a finding by the trial court is clearly erroneous, we are left "on the entire evidence ... with the definite and firm conviction that a mistake has been committd." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948); Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California, 113 S.Ct. 2264, 2279 (1993).
 
 
 59
 The trial and appellate courts suggested, but did not squarely hold, that PNB had a duty to Donicker to send an agent to Guam to attempt to settle the dispute between Donicker and Lu Island. The theory seems to be that when Puller withdrew, leaving a void as mortgage servicing agent, PNB became obligated to perform Puller's functions, one of which would be to participate actively in resolving disputes between Donicker and Lu Island.
 
 
 60
 The Loan Agreement imposed no such duty. The trial court found that PNB "wrote Donicker and said that it had to assume greater responsibility due to Puller's demise." Doubtless the absence of Puller made it more difficult for both Donicker and PNB to carry on when there was no "middle man," especially in view of the distance between Pittsburgh and Guam. PNB's letter was no more than a recognition of this increase in its burden, and by no means was an agreement to perform the additional duties of mortgage servicing agent, if, indeed, those duties included mediation of disputes.
 
 
 61
 As we analyze the transaction, GEDA was the borrower from the bond holders and the lender to Donicker. The transaction seems to have been structured by GEDA and Matthews & Wright, the underwriter. Although PNB as well as GEDA signed the Loan Agreement, PNB was the Trustee of the funds, and its duty to Donicker was limited to disbursement whenever Donicker fulfilled the conditions precedent.
 
 III. Letter of Credit Claim
 The Superior Court found:
 
 62
 A Supplemental Agreement to the Loan Agreement was entered into between the parties. Since the loan called for one hundred percent (100%) financing, it was agreed that Donicker was entitled to ... [$145,000] for its pre-loan equity in the project. GEDA, through assignment to PNB as Trustee, required, however, that before Donicker would receive the ... [$145,000] from the loan proceeds that it cause a letter of credit to be issued to PNB as additional debt reserve.
 
 
 63
 Mar. 16, 1990 Decision p 28.
 
 
 64
 This finding is consistent with Mr. Holbrook's testimony concerning the Supplemental Loan Agreement that if he put up a $145,000 letter of credit, PNB would transfer $145,000 cash into Donicker's account. Although we would find it difficult so to interpret the document, PNB takes no issue on that point, and argues only that the letter of credit obtained by Donicker April 28, 1987, did not conform to the Agreement. PNB never made the transfer of money to Donicker, and Donicker never caused Citibank to amend the letter of credit as requested by PNB. Ultimately, in April, 1989, PNB drew on the letter of credit and received the $145,000, now held by PNB, pursuant to an agreement, in an interest bearing account, pending the outcome of this case. Donicker was required to pay Citibank and the court awarded Donicker $160,000, i.e., $145,000 plus $15,000 interest.
 
 
 65
 It seems clear that the letter of credit did not conform to the Agreement. The letter of credit provided that PNB could make a demand for payment "in the event there are insufficient moneys in the Bond Fund or Bond Reserve Fund to pay the principal and interest on the Bonds when due and payable." That meant that if Donicker failed to make required payment March 1, 1988, and thereafter, PNB would have to pay interest to bondholders out of the Reserve Fund as long as it lasted before being able to draw on the letter of credit. The Agreement required that the letter of credit "moneys shall be applied by the Trustee to pay principal or interest on the Bonds in the event that payment is not made by the Company." That meant that amounts not paid by Donicker when due could be made up by drawing on the letter of credit without first using the Reserve Fund. The Reserve Fund could remain intact, invested, and earning interest until the letter of credit was exhausted.
 
 
 66
 Mr. Richardson had originally drafted the proposed letter of credit including the mistaken reference to the Reserve Fund. Within a few days after receipt of the letter of credit, Mr. Richardson had noted the error and requested a change; but Donicker never obtained the amendment. Thus PNB did not breach the Agreement by refusing to pay Donicker $145,000 cash out of the loan proceeds in 1987.
 
 
 67
 In 1989, however, PNB drew on the letter of credit. In our view, PNB is not entitled to keep both the $145,000 proceeds of the letter of credit and the $145,000 portion of the bond proceeds it promised to Donicker. Presumably PNB was damaged to the extent it lost earnings on the invested Reserve Fund as a result of delay in being able to draw on the letter of credit, but we have found nothing in the record from which to determine any offset. That would be PNB's burden to prove.
 
 
 68
 We note that the Superior Court awarded Donicker $15,000 representing interest. As we view the case, Donicker was not entitled to receive the funds until PNB obtained them in April, 1989, and, accordingly, would not be entitled to interest until then. Mr. Holbrook testified that it was six or seven months between the date PNB called the letter of credit and the date he paid Citibank. He paid interest at 15%, or $12,687.50 if the period was seven months. PNB has not challenged the computation of interest. We deem it appropriate to affirm the judgment for $160,000 on this claim, and order the release to PNB of the interest bearing account in which the proceeds of the letter of credit were deposited.
 
 IV. PNB's Counterclaim
 
 69
 PNB filed a counterclaim, apparently for indemnification under an exception to the limitation on Donicker's liability under the Note. Its Prayer for Relief asks only attorney fees and costs. One of the findings of the Superior Court may opaquely suggest that PNB may have been attempting to recover its shortfall in payments to bondholders.
 
 
 70
 PNB's brief in this court (as well as before the Appellate Division) contends that the judgment in favor of Donicker and against PNB should be reversed as contrary to law and clearly erroneous. It contains no argument that it is entitled to judgment on its counterclaim and no request for remand. Under the circumstances, we deem the counterclaim waived.
 
 CONCLUSION
 
 71
 The judgment before us is that of the District Court of Guam, Appellate Division. Insofar as it affirmed the judgment of the Superior Court of Guam awarding $160,000 to Donicker Corporation with respect to the Supplemental Loan Agreement, the judgment is AFFIRMED, with the modification that the funds held by Pittsburgh National Bank are to be released to the Bank.
 
 
 72
 Insofar as the judgment affirmed other parts of the judgment of the Superior Court, it is REVERSED with directions to reverse those parts of the judgment of the Superior Court. Each party shall bear its own costs on this appeal.
 
 
 
 *
 Honorable Thomas E. Fairchild, Senior Circuit Judge, Seventh Circuit, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The copy of "Constructor's Performance Bond," in the record names Donicker as the "Obligee" or "Owner." Neither the bond nor any rider names PNB as an obligee, as required by Section 4.1(b)(xvi) of the Loan Agreement. PNB's brief does not make a point of this deficiency
 
 
 [2]
 We did not find a similar case where the implied covenant of good faith and fair dealing was applied. The covenant is often applied in situations involving an insurer's breach of an insurance contract, for the protection of employees where an employee is terminated after long-term service, or in franchise or dealership arrangements. See Carma, 826 P.2d at 726; Triangle Min. Co. v. Stauffer Chemical Co., 753 F.2d 734, 740 (9th Cir.1985) (citing cases)