[No. D024940. Fourth Dist., Div. One. Feb. 27, 1998.]

NATIONAL MEDICAL TRANSPORTATION NETWORK, Plaintiff and Respondent, v.
DELOITTE & TOUCHE et al., Defendants and Appellants.

## COUNSEL

Cooley, Godward, Castro, Huddleson & Tatum, Cooley Godward, Paul A. Renne, Michael G. Rhodes, Heller, Ehrman, White & McAuliffe, M. Laurence Popofsky, Michael L. Rugen and Alan A. Harley for Defendants and Appellants.

Bryant, Clohan, Ott, Maines & Baruh, Robert L. Maines, Meredith Fahn, Willkie, Farr & Gallagher, Louis A. Craco, Michael R. Young, Mary L. Gerdes and Richard I. Miller as Amici Curiae on behalf of Defendants and Appellants.

Corona & Balistreri, Richard D. Corona and Daniel S. Levinson for Plaintiff and Respondent.

## OPINION

**KREMER, P. J.**—Defendants Deloitte & Touche and Gordon Johns appeal a judgment after jury trial favoring plaintiff National Medical Transportation

Network (Medtrans) on its claims for professional negligence, breach of contract and negligent interference with prospective economic advantage.[1] Defendants claim instructional errors, evidentiary error and the lack of substantial evidentiary support for various jury findings. Finding instructional errors plus insufficient evidence of causation, we reverse the judgment.

## I

### INTRODUCTION

Seeking to obtain capital contributions by investors, Medtrans hired defendants as independent auditors to issue an opinion about its financial condition. After unsuccessfully seeking to resolve disagreements with Medtrans's management about the need for adjustments to the company's financial statements, defendants resigned without issuing an audit opinion. Although hiring successor auditors, Medtrans lost a potential $10 million capital investment.

Medtrans brought this lawsuit against defendants for committing professional negligence by withdrawing prematurely from the auditing engagement, breaching the parties' engagement contract by not issuing an audit opinion to plaintiff, and negligently interfering with Medtrans's prospective economic advantages with successor auditors and a potential investor by making defamatory statements impugning the honesty of Medtrans's management.

At trial Medtrans asserted defendants' wrongdoing caused it to lose a potential $10 million capital investment. Defendants claimed that under professional standards governing auditors they had good cause to resign from their engagement with Medtrans based upon their determinations that Medtrans's management was uncooperative, made unreliable financial representations and impaired defendants' independence by making threats. The parties disputed whether defendants' resignation was with good cause. However, the trial court gave a jury instruction not mentioning good cause but indicating instead that defendants' resignation was wrongful if unduly prejudicial to Medtrans's interests or occurring before Medtrans had reasonable opportunity to engage a successor auditor. The jury awarded Medtrans almost $10 million in damages against defendants.

Defendants contend the jury instruction on resignation misstated the professional standard governing their conduct; Medtrans did not meet its

---

[1]The judgment on Medtrans's cause of action for breach of contract was against defendant Deloitte only.

burden to show its damages were caused by defendants; admission of "baseless" testimony by Medtrans's damages expert was prejudicial error; the jury instruction on negligent interference with prospective economic advantage lacked the necessary element of independent wrongfulness; and Medtrans did not prove all elements of its cause of action for negligent interference with prospective economic advantage.

We reverse the judgment, concluding (1) the trial court prejudicially erred in giving an incorrect jury instruction on the standard governing defendants' resignation from their professional engagement with Medtrans; (2) the record was devoid of substantial evidence that defendants caused Medtrans's alleged damages for breach of contract; and (3) the jury instruction on negligent interference with economic advantage omitted the tort's "independent wrong" material element. In light of the disposition based on those issues, we do not reach defendants' attacks on the admission of Medtrans's damages expert's testimony or the sufficiency of the evidence for the finding defendants negligently interfered with Medtrans's prospective economic advantage.

## II

### FACTS

 In determining whether the court erred in instructing the jury on the standard governing defendants' withdrawal from their professional auditing engagement with Medtrans, we view the evidence in the light most favorable to defendants. (Cf. *Blackwell* v. *Hurst* (1996) 46 Cal.App.4th 939, 943 [54 Cal.Rptr.2d 209]; *Maxwell* v. *Powers* (1994) 22 Cal.App.4th 1596, 1607 [28 Cal.Rptr.2d 62]; *Bernal* v. *Richard Wolf Medical Instruments Corp.* (1990) 221 Cal.App.3d 1326, 1338 [272 Cal.Rptr. 41].)[2]

In 1988 ambulance service provider Medtrans retained as its independent auditor the predecessor of national accounting and auditing firm Deloitte.

---

[2]"In reviewing a claim of erroneously refused instructions, we review the evidence most favorable to the applicability of the instructions requested since a party is entitled to have the jury instructed on all theories presented which are supported by the evidence and pleadings." (*Blackwell* v. *Hurst, supra,* 46 Cal.App.4th at p. 943.)

"Parties have the 'right to have the jury instructed as to the law applicable to all their theories of the case which were supported by the pleadings and the evidence, whether or not that evidence was considered persuasive by the trial court.' [Citation.] 'A reviewing court must review the evidence most favorable to the contention that the requested instruction is applicable since the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented.' [Citation.]" (*Maxwell* v. *Powers, supra,* 22 Cal.App.4th at p. 1607.)

" '[A] litigant is entitled to instructions on every theory advanced by him which finds support in the evidence.' [Citations.] 'The evidence necessary to justify the giving of an

For fiscal years ending March 31, 1988, through March 31, 1991, Deloitte audited and issued reports on Medtrans's financial statements.

By 1992 Medtrans was highly leveraged, in need of cash and unable to pay its bills currently. Since Medtrans's primary lender had demanded repayment of its $12 million line of credit, Medtrans was seeking a replacement lender. Although Medtrans owed almost $2 million on its payroll tax obligations and its chief financial officer spent much of his time trying to cut the company's budget, Medtrans's chief executive officer Roberts drew a $400,000 salary.

As a partner in Deloitte, defendant Johns supervised the audit of Medtrans's financial statements for the fiscal year ending March 31, 1992 (fiscal 1992). At that time Medtrans's chief executive officer Roberts and Medtrans's president Morgan each owned 50 percent of Medtrans's common stock.

On June 9, 1992, with the fiscal 1992 audit in progress, Medtrans's chief financial officer Ensz resigned effective June 26, 1992.

On June 18, 1992, for the purpose of saying he could not sign a management letter attesting to the accuracy of Medtrans's financial statements since he did not think those statements were presented fairly, Ensz initiated a meeting with Johns.[3] At the meeting Ensz alerted Johns to four or five matters relevant to the audit. Ensz said that upon informing Roberts that those matters were not properly entered in Medtrans's journals, Roberts told Ensz to leave the journals as they were and "let's see" if the auditors "find it."[4] Questioning Roberts's character for honesty because of some things Roberts advocated in presenting financial information, Ensz also stated he lacked faith in the integrity of Roberts and Medtrans's financial statements.

Meanwhile, as the fiscal 1992 audit proceeded, Roberts sought to convince William Blair & Company (Blair) to invest capital in Medtrans. Based

---

instruction need not be overwhelming . . . [but] may be slight . . . or even opposed to the preponderance of the evidence.' [Citation.] In reviewing the propriety of a requested instruction, we view the evidence in the light most favorable to the party proposing it." (*Bernal* v. *Richard Wolf Medical Instruments Corp., supra,* 221 Cal.App.3d at pp. 1337-1338.)

[3]Under professional standards, independent auditors must obtain from a client's senior officers, normally the chief financial officer and chief executive officer, written representations generally including confirmation of the officers' belief that the company's financial statements fairly present the company's financial condition and results. (1 AICPA Professional Standards (CCH 1995) § 333.09.) *Management's refusal to sign a representation letter is sufficient to preclude an auditor from issuing an unqualified opinion and constitutes grounds to question the reliability of other management representations.* (*Id.* at § 333.11.)

[4]Deloitte's later audit testing revealed that Medtrans continued to account inaccurately with respect to those matters.

on unaudited financial statements provided by Roberts showing $1.9 million in profits during fiscal 1992, Blair preliminarily projected Medtrans's potential earnings in 1995 would be $5.7 million. Although those unaudited statements prepared showed fiscal 1992 earnings of $1.9 million, defendants concluded based on their own audit procedures that Medtrans actually lost about $500,000. Defendants proposed adjustments to Medtrans's financial statements. Attempting unsuccessfully to resolve the parties' differences, defendants worked with Medtrans for about eight weeks before eventually concluding Medtrans was stonewalling.

On July 9, 1992, as part of the attempted resolution of the parties' disagreements, defendants met with Roberts for their first substantive discussions about the audit. A very focused Roberts vocally and explicitly emphasized the importance of Medtrans's pretax earnings because of the potential that Blair might invest in the company. At the meeting defendants expressed concerns about Medtrans's practice of retaining inadvertent overpayments or duplicate payments from patients or insurers and treating such payments as earned income in its accountings. Johns presented Roberts with about $2.5 million in suggested adjustments involving the accounts receivable reserve account. Roberts told Johns: "You better not propose any adjustment that will queer my deal or you'll be sorry." Johns was shocked by Roberts's comments and felt threatened by Roberts. Soon after the meeting, Johns contacted Bluey, the partner in Deloitte's national office responsible for advising on troublesome situations and difficult clients. Johns expressed concern about Medtrans's commitment to fairly stated financial statements. Stating "we should not be associated with companies that threaten us," Bluey advised that defendants should resign unless Roberts agreed to the proposed adjustments. Johns said he wanted to give Medtrans time to analyze defendants' receivable reserve analysis since a $2 million to $3 million adjustment would be a shock for a company of Medtrans's size.

On July 27, 1992, Blair signed a nonbinding letter of intent agreeing to consider investing $10 million for 50 percent of Medtrans's common stock. Blair's letter of intent specified various conditions requiring satisfaction before Blair proceeded further. Blair's audit firm, Ernst & Young, assisted in Blair's investigation of Medtrans.

On July 30, 1992, at a meeting with defendants, Medtrans presented a memorandum about its accounts receivable reserve, Medtrans's first response to defendants' proposed adjustments to its unaudited financial statements. The parties also discussed defendants' conclusion that Medtrans's unaudited financial statements improperly recognized $80,000 income on a

purported equipment sale from one subsidiary of Medtrans to another. Roberts reiterated the importance of pretax earnings to consummation of the Blair investment transaction. Johns was concerned about Roberts's emphasizing that in Roberts's mind the investment transaction was the most important factor related to the financial statements.

On August 13, 1992, in a meeting with Medtrans, Johns presented a memorandum summarizing defendants' revised proposed adjustments to reduce by $3.1 million the income shown on Medtrans's unaudited financial statements. During Johns's presentation, Roberts rose, threw down the memorandum and said very angrily: "You are finished." Although Johns thought he had been fired, Roberts told Johns not to construe the situation that way. However, after Medtrans's successive rejections of proposed adjustments to its unaudited financial statements, Johns believed the parties' mutually exclusive views of those statements indicated there was no longer a basis for a relationship. Thus, Johns told Roberts that if defendants had not been fired he was resigning. Roberts told Johns that "you're going to finish this regardless, under court order or otherwise." Johns believed such threat destroyed any ability to continue as an independent auditor. Johns also believed resignation was necessary because Medtrans bullied Deloitte's personnel and defendants were put at risk by Medtrans's lack of commitment to financial statements accurately indicating the difficulties the company experienced in fiscal 1992.

On August 25, 1992, Blair told Roberts it was suspending investigation and requesting reimbursement under its letter of intent for expenses incurred. Blair indicated it would not proceed unless it received an independent auditor's report on Medtrans's unaudited financial statements for fiscal 1992. Blair also indicated that Medtrans needed to improve its internal controls and management of accounts receivable. Roberts never asked Blair to resume its investigation of Medtrans.

Meanwhile, after attempting unsuccessfully to convince defendants to withdraw their resignation, Roberts began searching for new auditors. At Blair's suggestion, Roberts contacted Ernst & Young, the firm that had audited Blair and assisted in Blair's investigation of Medtrans. On Medtrans's behalf, Roberts signed a letter authorizing Deloitte to discuss "freely" with Ernst & Young the audit history of Medtrans with Deloitte, the details of Deloitte's proposed audit of Medtrans for fiscal 1992 and the facts and circumstances of Deloitte's "withdrawal/resignation/disengagement" as

Medtrans's auditor.[5] Medtrans's Roberts and Morgan also signed a document providing that Medtrans agreed not to take action against Deloitte for complying with the authorization to engage in discussion with Ernst & Young.

On September 3, 1992, in a meeting requested by Roberts, Johns described what he planned to tell Ernst & Young. Consistent with such descriptions to Roberts, Johns met with Ernst & Young later that day and explained his reasons for resigning, including his concerns about Medtrans's senior management's integrity. Before the end of the month, Ernst & Young signed an engagement letter agreeing to serve as Medtrans's independent auditors. However, in early October 1992 before beginning any significant work, Ernst & Young was discharged by Roberts, who indicated he was pursuing another potential investor, American Medical Response, Inc. (AMR).

At AMR's suggestion, Roberts replaced Ernst & Young with AMR's auditors, KPMG Peat Marwick (Peat Marwick). On Medtrans's behalf, Roberts signed a letter authorizing Deloitte to speak freely with Peat Marwick about Deloitte's audit of Medtrans, including the facts and circumstances of Deloitte's "withdrawal/resignation/disengagement" as Medtrans's auditor. After interviewing Deloitte, Peat Marwick accepted the engagement with Medtrans. However, a week later Peat Marwick resigned in accordance with a directive from its New York office.

After interviewing Deloitte, Medtrans's former independent auditor Silberman agreed to audit Medtrans. Ultimately, Medtrans and Silberman agreed to make almost all adjustments defendants originally suggested to Medtrans's unaudited financial statements. In December 1992 Silberman issued an "unqualified" report on Medtrans's adjusted fiscal 1992 financial statements showing a $480,000 loss.

In June 1993 Medtrans sold its assets to Laidlaw Medical Transportation, Inc. (Laidlaw) for $33 million. After payment of Medtrans's liabilities, Roberts and Morgan received $3 million net from the Laidlaw transaction. Roberts and Laidlaw entered into noncompetition and consulting agreements providing that Roberts would receive $2.3 million over the next five years.

---

[5]Professional standards require a successor auditor to interview its predecessor. (1 AICPA Professional Standards, *supra*, at § 315.)

# III

## Superior Court Proceedings

In August 1993 Medtrans sued defendants for professional negligence, breach of contract, and negligent interference with prospective economic advantage.[6] Asserting defendants' wrongdoing caused Blair not to invest capital in the company, Medtrans sought damages for the difference between the proceeds of its 1993 asset sale to Laidlaw and the amount Medtrans would have been worth in 1995 if Blair had invested.

In July 1995 the matter came for trial. Medtrans's expert Rossi testified that defendants resigned prematurely without sufficient "competent evidential matter." Defendants' expert Kleiner testified that defendants' resignation was permissible under professional standards once they lost faith in the honesty of Medtrans's senior management and thus could not complete the audit. Kleiner also testified that defendants' resignation was required under professional standards once their independence was compromised by Roberts's threats.

After Medtrans rested, the court granted nonsuit on its claim against Johns for breach of contract. Ultimately, the lawsuit went to the jury.

On Medtrans's claim for professional negligence against both defendants, the jury by special verdict found: At least one defendant was negligent; such negligence was a cause of injury or damage to Medtrans; and Medtrans was not contributorily negligent with regard to its claim.

On Medtrans's claim for breach of contract against defendant Deloitte, the jury by special verdict found: Deloitte breached its contract with Medtrans; and Deloitte's breach caused injury or damage to Medtrans.

On Medtrans's claim for negligent interference with prospective economic advantage against both defendants, the jury by special verdict found: Medtrans had economic relationships with third parties Blair, Ernst & Young, and Peat Marwick containing probable future economic benefit or advantage to Medtrans; at least one defendant knew of the existence of those

---

[6]Medtrans also alleged causes of action for breach of fiduciary duty, intentional interference with prospective advantage, and fraud. However, as defendants prevailed at trial on those causes of action, they are not at issue in this appeal.

Further, the lawsuit initially included Morgan and Roberts as additional named plaintiffs. However, Morgan dismissed his claims with prejudice and defendants prevailed at trial on all of Roberts's claims. Neither Morgan nor Roberts is a party to this appeal.

relationships; at least one defendant negligently engaged in acts or conduct while aware or constructively aware that those acts or conduct would interfere with or disrupt those relationships; those relationships were actually interfered with or disrupted; Medtrans suffered damages caused by acts of the defendants designed to interfere with or disrupt those relationships; and Medtrans was not contributorily negligent with regard to its claim.[7]

By special verdict the jury also found Medtrans suffered $9,680,179 loss of stock value and $248,747 other damages under any or all of its claims for professional negligence, breach of contract, and negligent interference with prospective economic advantage.

On November 17, 1995, the court entered an amended judgment favoring Medtrans against both defendants for $9,928,926 plus costs. Defendants appeal.

IV

DISCUSSION

A

*Jury Instruction on Duration of Defendants' Professional Responsibility*

Instructing the jury on the duration of defendants' professional responsibility, the court stated: "Once an accountant has undertaken to serve a client, the employment and duty as an accountant continues until ended by consent or request of the client or the accountant withdraws from the employment, if it does not unduly jeopardize the interest of the client, after giving the client notice and a reasonable opportunity to employ another accountant or the matter for which the person was employed has been concluded." (See BAJI No. 6.37.3.)[8]

---

[7] The jury found for defendants on Medtrans's negligent interference with prospective economic advantage involving third party AMR.

[8] The Use Note to BAJI No. 6.37.3 states such instruction should not be given "if the rule stated is not within the professional standards of the profession involved." As we shall explain, the rule stated by the challenged instruction was not within applicable professional standards for auditors.

Defendants challenge such instruction as contrary to applicable professional standards governing auditors.[9] Specifically, defendants contend that

---

[9]Defendants, along with amici curiae American Institute of Certified Public Accountants (AICPA) and California Society of Certified Public Accountants, identify various professional auditing standards as applicable here:

"It is of utmost importance to the profession that the general public maintain confidence in the independence of independent auditors. Public confidence would be impaired by evidence that independence was actually lacking, and it might also be impaired by the existence of circumstances which reasonable people might believe likely to influence independence. To *be* independent, the auditor must be intellectually honest; to be *recognized* as independent, he must be free from any obligation to or interest in the client, its management, or its owners. . . . Independent auditors should not only be independent in fact; they should avoid situations that may lead outsiders to doubt their independence." (1 AICPA Professional Standards, *supra*, at § 220.03, italics in original.)

"Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions consistent with management's assertions embodied in the financial statements. . . . The independent auditor may make suggestions about the form or content of the financial statements or draft them, in whole or in part, based on information from management during the performance of the audit. However, the auditor's responsibility for the financial statements he . . . has audited is confined to the expression of his . . . opinion on them." (1 AICPA Professional Standards, *supra,* at § 110.02.)

An auditor's duty is not only to the client but also to the public trust. (1 AICPA Professional Standards, *supra*, at § 504.08.) Hence, an independent auditor is required to place the integrity of the financial reporting process above the client's stated objectives. (2 AICPA Professional Standards (CCH 1995) § 53.)

An auditor must be "without bias with respect to the client" and maintain total "impartiality." (1 AICPA Professional Standards, *supra*, at § 220.02.) "In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors." (*Id.* at § 150.02.) An auditor may not "accommodate deceit or subordination of principle" and must remain "impartial, intellectually honest, and free of conflicts of interest." (2 AICPA Professional Standards, *supra*, at §§ 54.02 & 55.01.)

An auditor must "decide as a matter of professional judgment" whether he is independent. (1 AICPA Professional Standards, *supra*, at § 504.08.) An auditor who believes independence has been impaired is forbidden from issuing an audit opinion. (2 AICPA Professional Standards, *supra*, at §§ 191.148-191.149.)

An auditor's "independence may be impaired whenever the member and the member's client company or its management are in threatened or actual positions of material adverse interests by reason of threatened or actual litigation." (2 AICPA Professional Standards, *supra*, at § 101.08.) "An expressed intention by the present management to commence litigation against the member alleging deficiencies in audit work for the client would be considered to impair independence if the auditor concludes that it is probable that such a claim will be filed." (*Ibid.*)

Defendants also cite a federal Securities and Exchange Commission (SEC) rule providing that after resignation of its independent auditor, a reporting company must file documents with the SEC disclosing the resignation with the auditor's description of disagreements with the client and the auditor's questions about the reliability of financial statements or management's representations. (Fed. Sec. L. Rep. (CCH) ¶ 72,434 (1989).) Under certain circumstances, federal law requires an auditor to resign immediately and report the

where permitted or required to resign by professional standards, an auditor can do so regardless of the effect on the client's "parochial interests" and regardless of the presence of a successor auditor. Defendants assert that by erroneously focusing on their resignation's effect on Medtrans, the challenged instruction effectively directed a verdict against defendants on all liability issues. Reviewing de novo the legal issue whether the challenged instruction was erroneous (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1089 [25 Cal.Rptr.2d 867, 864 P.2d 40]), we conclude the court prejudicially erred in giving such instruction to the jury.

1

*Defendants Did Not Invite or Waive Error in Instruction on Resignation*

■ Preliminarily, we reject Medtrans's contention that defendants have not preserved for appeal the issue whether the jury instruction on the duration of their professional responsibility was erroneous. During the trial court's review of proposed jury instructions with counsel, defendants objected to the challenged instruction. Defendants asserted the language of BAJI Nos. 6.37 and 6.37.1 adequately covered the issue of the duration of their professional responsibility.[10] Defendants also asserted the challenged instruction was not supported by the testimony of Medtrans's own expert. Responding to defendants' objection, the court stated: "If you want to submit

resignation to the SEC within one business day. (Fed. Sec. L. Rep. (CCH) ¶ 85,710 (1995).) Federal law immunizes auditors against suit for any statement contained in such reports. (15 U.S.C. § 78j-1(b)(2)-(4).)

Amici curiae cite a provision in the Private Securities Litigation Reform Act of 1995 imposing obligations on an auditor involving public disclosure of the client's illegal acts. For example, under certain circumstances, an auditor believing that a client has likely committed an illegal act materially affecting the financial statements may be obligated, absent the client's appropriate remediation, to resign and report its findings to the SEC. (15 U.S.C. § 78j-1(b)(2)-(4); see also 17 C.F.R. § 229.304(a)(1) & (3) (1995).)

[10]The trial court instructed the jury in the language of BAJI No. 6.37: "In performing professional services for a client, an accountant has the duty to have that degree of learning and skill ordinarily possessed by reputable accountant[s], practicing in the same or a similar locality and under similar circumstances. [¶] It is a further duty to use the care and skill ordinarily used in like cases by reputable members of the same profession practicing in the same or a similar locality under similar circumstances, and to use reasonable diligence and best judgment in the exercise of professional skill and in the application of learning, in an effort to accomplish the purpose for which the professional was employed. [¶] A failure to fulfill any such duty is negligence."

The court also instructed the jury in the language of BAJI No. 6.37.1: "It is the duty of an accountant who holds himself or herself out as a specialist in a particular field of accounting, to have the knowledge and skill ordinarily possessed, and to use the care and skill ordinarily used, by reputable specialists practicing in the same field and in the same or a similar locality and under similar circumstances. [¶] A failure to fulfill any such duty is negligence."

an alternate instruction to this on the duration of an accountant's professional liability, or you can present some law to the court that states in better terms than 6.37.3 when an accountant can withdraw, I'll consider it." Although telling the court he would present something the next day, defendants' counsel presented nothing. Based upon that record, Medtrans contends defendants waived or invited any alleged instructional error involving their resignation by not presenting an alternate instruction on the duration of their professional responsibility. (*Merlo* v. *Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 13 [130 Cal.Rptr. 416];[11] *Downing* v. *Barrett Mobile Home Transport, Inc.* (1974) 38 Cal.App.3d 519, 523 [113 Cal.Rptr. 277].)

However, where, as here, the "trial court gives a jury instruction which is prejudicially *erroneous as given*, i.e., which is an incorrect statement of law, the party harmed by that instruction need not have objected to the instruction or proposed a correct instruction of his own in order to preserve the right to complain of the erroneous instruction on appeal." (*Suman* v. *BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 9 [28 Cal.Rptr.2d 133], italics in original; accord, *Mattco Forge, Inc.* v. *Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 841 [60 Cal.Rptr.2d 780].) Any holding making it " ' "the duty of a party to correct the errors of his adversary's instructions . . . would be in contravention of section 647, Code of Civil Procedure, which gives a party an exception to instructions that are given . . . ." ' " (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 949 [160 Cal.Rptr. 141, 603 P.2d 58].) The cases relied upon by Medtrans are inapposite as involving circumstances not present here, to wit, where a party is deemed to waive a right to challenge an instruction on appeal for failure to request an additional or qualifying instruction to an instruction given by the court which, though correct as far as it went, was too general for the state of the evidence. (*Mattco Forge, Inc.* v. *Arthur Young & Co., supra,* at p. 842; *Suman* v. *BMW of North America, Inc., supra,* at p. 9; *U.S. Roofing, Inc.* v. *Credit Alliance Corp.* (1991) 228 Cal.App.3d 1431 [279 Cal.Rptr. 533].)

2

### Instruction on Resignation Was Erroneous

The Supreme Court has observed: "The AICPA's professional standards refer to the public responsibility of auditors: 'A distinguishing mark of a profession is acceptance of its responsibility to the public. The accounting

---

[11] In *Merlo* v. *Standard Life & Acc. Ins. Co., supra,* 59 Cal.App.3d 5, the appellate court stated: " 'In a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion.' [Citation.]" (*Id.* at p. 13.)

profession's public consists of clients, credit grantors, governments, employers, investors, the business and financial community, and others who rely on the objectivity and integrity of certified public accountants to maintain the orderly functioning of commerce. This reliance imposes a public interest responsibility on certified public accountants.' (2 AICPA Professional Standards (CCH 1988) § 53.01.)" (*Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 383 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835].) Further, " '[b]y certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a *public* responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust.' " (*Id.* at pp. 383-384, italics in original.)

■ The parties agree that an auditor may permissibly resign for good cause. However, although the parties' experts testified that professional standards permit resignation by an auditor under certain circumstances, the expert testimony conflicted on whether defendants' resignation complied with those professional standards. Defense expert Kleiner testified defendants' resignation was justified by Medtrans's management's lack of cooperation, defendants' loss of faith in Medtrans's integrity and Roberts's threats comprising defendants' independence. Medtrans's expert Rossi testified that defendants lacked sufficient evidence to support their decision to resign and thus should have explored other options further.

Since defendants' basic theory of defense that their resignation with good cause complied with professional standards found support in " 'some evidence of a substantial character,' " they were entitled to an instruction on such theory. (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 548 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158]; *Heard* v. *Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1758 [52 Cal.Rptr.2d 620]; *Bernal* v. *Richard Wolf Medical Instruments Corp., supra,* 221 Cal.App.3d at p. 1338; *Thompson* v. *Package Machinery Co.* (1971) 22 Cal.App.3d 188, 193 [99 Cal.Rptr. 281].) However, the court did not instruct the jury on defendants' theory. Despite expert testimony that the propriety of an auditor's resignation should be determined under professional standards, the challenged instruction made no mention of professional standards, good cause or defendants' reasons for resigning. Hence, the court erred in not giving the jury the requisite guidance to evaluate the experts' conflicting conclusions on whether defendants' resignation was permissible under professional standards. (*Bernal* v. *Richard Wolf Medical Instruments Corp., supra,* at p. 1338;

see also *Mattco Forge, Inc.* v. *Arthur Young & Co., supra,* 52 Cal.App.4th at pp. 842-843; *Bay Summit Community Assn.* v. *Shell Oil Co.* (1996) 51 Cal.App.4th 762, 778 [59 Cal.Rptr.2d 322].)

Further, the challenged instruction erroneously misstated the professional standards applicable to defendants as auditors. Johns and defense expert Kleiner testified that an auditor may properly resign where permitted or required by professional standards regardless whether such resignation may jeopardize the client's interest. Medtrans did not present any expert testimony to the contrary. Hence, uncontradicted evidence indicated the challenged instruction erroneously stated that defendants could not properly resign if Medtrans's interest would be unduly jeopardized.

Moreover, contrary to the challenged instruction, an auditor permitted or required to resign by professional standards need not before resigning give the client a reasonable opportunity to employ a successor auditor. Johns and defense expert Kleiner testified that an auditor who may properly resign under professional standards is not required to remain until the client has been afforded reasonable opportunity to engage a successor auditor. Instead, professional standards simply require an auditor to cooperate with the client's attempt to retain a successor auditor by responding "promptly and fully on the basis of facts known to [the auditor], to the successor's reasonable inquiries." (1 AICPA Professional Standards, *supra,* at § 315.07.) Defense witnesses also testified that professional standards prohibit an auditor from remaining until employment of a successor once the client's threats have impaired the auditor's independence. Medtrans did not present any expert testimony to the contrary. Hence, uncontradicted evidence indicated the challenged instruction erroneously stated that defendants could not properly resign without affording Medtrans a reasonable opportunity to employ a successor auditor.[12]

In sum, the record contained evidence to support defendants' theory they had good cause to resign based upon their reasonable determinations that Medtrans's management lacked commitment to honesty in financial reporting, the reliability of Medtrans's management's representations should be questioned and defendants could no longer present themselves to the public as independent auditors for Medtrans either in fact or in appearance. When defendants presented their initial audit results, Medtrans's chief executive

[12]As noted by defendants, the challenged instruction was also inconsistent with the policy behind SEC regulations requiring disclosure within five days of an auditor's resignation as important "in bringing to light disagreements or difficulties concerning management policies or practices that may be material to an investment decision with regard to the registrant's securities." (Fed. Sec. L. Rep., *supra,* at ¶ 72,434, p. 62,129.)

officer Roberts responded with a threat. Despite knowing defendants and Medtrans's own chief financial officer had determined Medtrans's unaudited financial statements to be materially inaccurate, Roberts continued his attempts to market Medtrans's shares based on those statements.[13] The parties' differences over the audit persisted despite defendants' attempts at resolution. Ultimately, Roberts told Johns "you're finished." Johns replied defendants' only choice was to resign. Eventually, a successor auditor engaged by Medtrans issued an audit report reflecting Medtrans's agreement to make the most of the financial statement adjustments initially proposed by defendants. However, by making defendants' ability to resign subordinate to Medtrans's interests, the challenged instruction conflicted with defendants' obligation as auditors to maintain independence. As discussed, defendants' public responsibilities as auditors were not defined by benefit or prejudice to Medtrans but instead transcended the parties' employment relationship. (*Bily* v. *Arthur Young & Co., supra,* 3 Cal.4th at p. 383.) Although the court gave a correct general instruction on the traditional "reasonable accountant" standard of care, the more specific challenged instruction given by the court was erroneous, resulted in the "entire absence of instructional support" for the defense theory of good cause to resign and thus foreclosed a verdict for defendants on such theory of defense. (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 581 [34 Cal.Rptr.2d 607, 882 P.2d 298]; *Fiatarone* v. *Masterson* (1960) 180 Cal.App.2d 305, 309 [4 Cal.Rptr. 610].)

Medtrans acknowledges that the parties' experts testified "good cause" could justify an auditor's resignation. Medtrans also acknowledges that where professional standards permit or compel an auditor to resign, the resignation's effect on the client does not constitute a ground for nonapplication of those standards. However, Medtrans contends the word "unduly" as used in the challenged instruction encompassed the concept of "good cause" by assertedly referring to both the degree of jeopardy to the client's interest from an auditor's resignation and the justification for such harm. Medtrans's contention must be rejected because when reasonably read in its entirety, the challenged instruction did not convey to the jury that professional standards permit or compel an auditor to resign if good cause exists. (*People* v. *Jennings* (1991) 53 Cal.3d 334, 386 [279 Cal.Rptr. 780, 807 P.2d 1009]; *People* v. *Laws* (1993) 12 Cal.App.4th 786, 796 [15 Cal.Rptr.2d 668]; *Sill Properties, Inc.* v. *CMAG, Inc.* (1963) 219 Cal.App.2d 42, 53 [33 Cal.Rptr. 155].) As used in the challenged instruction, the word "unduly" did not encompass the concept of defendants' resignation jeopardizing

---

[13]Such continuing marketing attempts could constitute a ground for resignation under the standard asserted by Medtrans's expert Rossi that an auditor may properly resign when faced with evidence the client is engaging in fraud.

Medtrans's interest justifiably due to defendants' good cause to resign. Instead, the word "unduly" in the challenged instruction referred simply to the degree of harm to Medtrans's interest by modifying only the word "jeopardize." Hence, as defendants contend, the court erroneously omitted from the challenged instruction the "good cause to resign" element of the professional standards applicable to defendants as auditors.

3

*Erroneous Instruction on Resignation Prejudiced Defendants*

■ Defendants contend the court prejudicially erred in giving the instruction on resignation misconstruing the essence of their roles as professional auditors. Defendants assert that instead of focusing the jury on the effect of defendants' resignation on Medtrans, the court should have instructed the jury to determine whether defendants complied with applicable professional standards. Medtrans responds that any error in the challenged instruction was harmless since the jury assertedly found defendants liable on all causes of action based on issues unrelated to their resignation. We conclude the instructional error was prejudicial to defendants.

■ "Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citations.] Of course, that determination depends heavily on the particular nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury. [¶] But the analysis cannot stop there. Actual prejudice must be assessed in the context of the individual trial record." (*Soule* v. *General Motors Corp., supra,* 8 Cal.4th at p. 580.)

"In assessing prejudice from an erroneous instruction, we consider, insofar as relevant, '(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations].' " (*Soule* v. *General Motors Corp., supra,* 8 Cal.4th at pp. 570-571.) Such multifactor test "is as pertinent in cases of instructional omission as in cases where instructions were erroneously given. Thus, when deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580-581.)

(a)

*Evidentiary Record Indicates Erroneous Instruction Was Prejudicial*

■ The state of the evidence about defendants' alleged professional negligence "was far from clear or overwhelming." (*Kaljian* v. *Menezes* (1995) 36 Cal.App.4th 573, 589 [42 Cal.Rptr.2d 510].) Instead, as discussed, the parties presented conflicting expert testimony on whether defendants' resignation complied with those professional standards. Defendants' expert testified defendants had good cause to resign, while Medtrans's expert stated defendants lacked sufficient basis for resigning and instead should have further explored other options.

■ Further, in "negligence cases arising from the rendering of professional services, as a general rule the standard of care against which the professional's acts are measured remains a matter peculiarly within the knowledge of experts. Only their testimony can prove it, unless the lay person's common knowledge includes the conduct required by the particular circumstances." (*Unigard Ins. Group* v. *O'Flaherty & Belgum* (1995) 38 Cal.App.4th 1229, 1239 [45 Cal.Rptr.2d 565]; accord, *Blackwell* v. *Hurst, supra,* 46 Cal.App.4th at p. 943.)[14] ■ Medtrans presented expert testimony on only one theory of liability for professional negligence, to wit, whether defendants improperly resigned and thus prevented Medtrans from securing additional financing by destroying the proposed Blair investment transaction. Medtrans presented no evidence defendants damaged Medtrans by breaching any applicable professional standard of care other than through their assertedly premature resignation from their auditing engagement with Medtrans. (*Blackwell* v. *Hurst, supra,* at p. 943; *Unigard Ins. Group* v. *O'Flaherty & Belgum, supra,* at p. 1239; *Nola M.* v. *University of Southern California* (1993) 16 Cal.App.4th 421, 436, fn. 8 [20 Cal.Rptr.2d 97].[15]) Hence, nothing in the record warrants a conclusion the jury reached its liability findings on a basis untainted by the erroneous resignation instruction.

Moreover, as discussed, defendants' expert Kleiner testified that where an auditor has good cause to resign, professional standards do not require

---

[14]The court instructed the jury accordingly: "You must determine the standard of professional learning, skill and care required of the defendants only from the opinions of the accountants who have testified as expert witness as to such standard. . . ."

[15]In *Nola M.* v. *University of Southern California, supra,* 16 Cal.App.4th 421, the appellate court noted the plaintiff's "expert described abstract negligence but he did not provide evidence of any causal connection between the negligence and the injury." (*Id.* at p. 436, fn. 8.)

consideration of harm to the client or preclude resignation before appointment of a successor auditor. Kleiner also testified that professional practices permit an auditor with good cause to resign from an engagement to perform an audit and render an opinion. However, the erroneous instruction effectively defined as negligent any resignation by defendants unduly jeopardizing Medtrans's interest or occurring before Medtrans had a reasonable opportunity to retain a successor auditor, regardless whether defendants had good cause to resign. Hence, the erroneous instruction on resignation foreclosed jury consideration of both the primary issue of liability and the primary defense, to wit, whether defendants had good cause to resign consistent with professional standards. In sum, the state of the evidence supports a conclusion the erroneous instruction was prejudicial. (*Soule* v. *General Motors Corp., supra,* 8 Cal.4th at pp. 570-571.)

(b)

### Other Instructions Did Not Remedy Erroneous Instruction on Resignation

Further, the prejudice caused by the erroneous jury instruction on resignation was not mitigated by other instructions conveying the proper legal standard. (*Soule* v. *General Motors Corp., supra,* 8 Cal.4th at pp. 570-571.) The jury received an incorrect specific instruction on the elements to be considered in determining the case's central issue, to wit, whether defendants' resignation was proper as based on good cause. None of the general instructions directly addressed the resignation issue. Although the general instruction on professional duty correctly describing the "reasonable accountant" standard might have provided an adequate framework for evaluating defendants' resignation, such instruction did not specifically refer to an auditor's right to resign and thus failed to cure the erroneous specific instruction given on resignation. (*Fiatarone* v. *Masterson, supra,* 180 Cal.App.2d at p. 309.) Indeed, the appellate court in *Fiatarone* stated that where "general instructions are correct and specific instructions addressed to the same point are incorrect, the error cannot be cured." (*Id.* at pp. 308-309.) In any event, the specific erroneous instruction on resignation given by the trial court resulted in the "entire absence of instructional support" for the defendants' theory of good cause to resign and thus foreclosed a defense verdict on such theory of defense. (*Soule* v. *General Motors Corp., supra,* at p. 581; *Fiatarone* v. *Masterson, supra,* at p. 309.)

(c)

### Medtrans's Argument Did Not Remedy Erroneous Instruction's Misleading Effect

Medtrans's counsel's opening statement and closing argument both focused primarily on the issue whether defendants' resignation from the

audit caused Medtrans's "demise" with little discussion whether such resignation was improper. Specifically, during opening statement Medtrans's counsel indicated that Medtrans told defendants that if they resigned Medtrans's "investor agreement with Will Blair Company is going to collapse, and you're going to cause a demise of this company's worth." Medtrans's counsel also stated that "because of this walk away by Deloitte & Touche . . . that transaction with Will Blair collapses." In sum, Medtrans's counsel's arguments at trial did nothing to remedy the misleading and prejudicial effect of the erroneous jury instruction on resignation. (*Soule* v. *General Motors Corp., supra,* 8 Cal.App.4th at pp. 570-571.)

(d)

*Instructional Error Requires Reversal of Verdict on Professional Negligence*

Based on the factors discussed above, the erroneous jury instruction on resignation must be considered prejudicial. It is reasonably likely that the verdict favoring Medtrans on its claim for professional negligence was based upon the erroneous instruction given on the elements the jury was to consider in determining the propriety of defendants' resignation from their professional auditing engagement with Medtrans. (*Soule* v. *General Motors Corp., supra,* 8 Cal.4th at pp. 570-571; *Mattco Forge, Inc.* v. *Arthur Young & Co., supra,* 52 Cal.App.4th at pp. 842-843; *Bay Summit Community Assn.* v. *Shell Oil Co., supra,* 51 Cal.App.4th at p. 778.) Hence, since tainted by the erroneous instruction, the portion of the verdict on professional negligence must be reversed.

B

*Medtrans's Failure to Prove Defendants Caused Blair's Failure to Invest*

At trial Medtrans asserted that defendants' wrongdoing caused Blair not to invest capital in Medtrans. Medtrans thus sought damages from defendants for the difference between the proceeds of its 1993 asset sale to Laidlaw and the amount Medtrans would have been worth in 1995 if Blair had invested. The jury awarded Medtrans damages from defendants for its loss in value and for the costs of consultants, advisers and professionals hired by Medtrans to deal with creditors, investors and tax authorities Medtrans could not pay. Asserting the jury's damages award rested only on the theory defendants caused Medtrans's loss of the proposed Blair investment, defendants attack as devoid of substantial evidentiary support the jury's finding that their alleged wrongdoing caused the Blair transaction to fail. Stated otherwise, defendants contend Medtrans did not prove the Blair

transaction would have been reasonably certain to consummate absent defendants' resignation from its engagement with Medtrans.

Medtrans responds that the record contained substantial evidence establishing that defendants' resignation and breach of contract in (1) not issuing an audit opinion; (2) not disclosing irregularities, errors or concerns to Medtrans's management; (3) making wrongful statements to successor auditors; and (4) not meeting the standard of care with respect to audit procedures and access to working papers were substantial factors in causing the failure of the proposed Blair investment transaction. However, as we shall explain, Medtrans did not prove that defendants' wrongdoing caused Blair not to invest in Medtrans.[16]

Deloitte's engagement letter to Medtrans stated: "The objective of our audit is the expression of an opinion on [Medtrans's] financial statements. Our ability to express that opinion, and the wording of our opinion, will, of course, be dependent on the facts and circumstances at the date of our report." Under the terms of its engagement with Medtrans, Deloitte agreed to comply with generally accepted auditing standards. Hence, if Deloitte's resignation violated applicable professional standards, such resignation would also constitute a breach of contract. Thus, to the extent it was based upon Deloitte's resignation assertedly violating professional standards, Medtrans's claim for breach of contract simply recast its professional negligence theory in other terms.[17] Since the erroneous instruction on resignation purportedly explained the circumstances permitting proper resignation by Deloitte from its "employment and duty as an accountant" whether

---

[16]Defendants' asserted nondisclosure of irregularities, errors or concerns to Medtrans's management and defendants' asserted failure to meet the standard of care with respect to audit procedures and access to work papers invoked the issue whether defendants were professionally negligent. However, as discussed at length, Medtrans did not present evidence supporting a finding of liability for professional negligence on any theory other than defendants' assertedly wrongful resignation, a theory on which reversal is required in any event due to instructional error. Further, Medtrans presented no evidence connecting collapse of the Blair transaction to defendants' asserted nondisclosures to Medtrans's management or defendants' asserted breaches of duty involving audit procedures and access to working papers. Moreover, the issue of defendants' asserted wrongful statements to successor auditors will be discussed below in connection with the prejudicial instructional error on the elements of negligent interference with prospective economic damages. Hence, we proceed to analyze the issue of causation only with respect to Deloitte's asserted breach of contract by failing to issue an audit opinion.

[17]At trial Medtrans's evidence focused primarily on defendants' resignation as the conduct causing harm to Medtrans. Medtrans's chief executive officer Roberts testified that he "could foresee grave injury to the company" from defendants' resignation and after such resignation the deal with Blair dissolved. By letter of August 17, 1992, Roberts warned Deloitte of the damage its resignation would do to the Blair deal. Medtrans's damages expert based his opinion on the asserted detrimental effects of defendants' resignation.

defined by professional standards or by contract, the instruction tainted the breach of contract verdict to the extent it was based on wrongful resignation.

Further, to the extent it was based upon Deloitte's failure to render an "unqualified" opinion on Medtrans's financial statements, the breach of contract verdict was unsupported by substantial evidence on the element of causation, to wit, that absent Deloitte's failure to render such opinion the Blair investment transaction would likely have occurred. Based on Deloitte's audit procedures, an "unqualified" opinion by Deloitte on the fiscal 1992 financial statements prepared by Medtrans's management would have reported that Medtrans's purported earnings of $1.9 million were materially overstated. Medtrans did not present any expert testimony indicating that Deloitte was required to issue an "unqualified" opinion on those materially misstated financial statements or that Deloitte's proposed adjustments were unreasonable. Medtrans's chief executive officer Roberts testified it was uncertain whether the Blair deal would have been consummated if the management-prepared financial statements had been changed as a result of the audit. Testimony from a Blair representative indicated that Blair declined to proceed without a report from independent auditors confirming that Medtrans's "earnings were what we thought they were for fiscal 1992 and therefore were supporting what we thought they would be in the future." Blair's representatives also testified that absent such an audit report, Blair lacked a reliable basis to analyze Medtrans's value. Further, evidence indicated that a few months later Medtrans agreed to almost all financial statement adjustments originally suggested by defendants and, consistent with those adjustments, Medtrans's successor auditor Silberman issued an "unqualified" report on the company's adjusted fiscal 1992 financial statements showing a $480,000 loss. Deloitte cannot be liable to Medtrans in breach of contract for having declined to issue a false "unqualified" audit report to the contrary.

Undaunted, Medtrans contends Deloitte breached the parties' contract not only by failing to render an "unqualified" auditor's opinion on Medtrans's financial statements but also by not rendering any opinion at all. However, the record lacked substantial evidentiary support for a conclusion the Blair deal would have consummated even if Deloitte had issued other than an "unqualified" audit opinion on Medtrans's financial statements.

The primary emphasis of Medtrans's counsel's arguments was also that Medtrans was harmed by defendants' resignation from the audit. During closing argument, Medtrans's counsel stated: "What is the negligence that we contend occurred? What is the breach that we contend occurred? [¶] Very simply: they contracted over a course of years, and in connection with the year of 1992, to perform an audit and to render an opinion, they did neither, and walked away after getting payment for such services."

In testifying that defendants resigned prematurely without sufficient "competent evidential matter," Medtrans's expert Rossi stated defendants should have pursued further several alternatives to resignation, to wit, (1) attempting to convince Medtrans to change its purported earnings of $1.9 million to a loss of $500,000; (2) issuing a "qualified" opinion that Medtrans's financial statements fairly reflected its performance and condition with specified exceptions on which defendants expressed no opinion; (3) issuing an "adverse opinion" that Medtrans's financial statements did not accurately reflect its financial condition and performance; or (4) issuing a disclaimer that defendants could not express any opinion on Medtrans's financial statements. However, Rossi declined to state an opinion on which alternative defendants should have chosen. Further, Medtrans did not produce evidence indicating that any of the assertedly available "qualified" alternatives suggested by Rossi would have satisfied Blair's desire for a report from independent auditors confirming that Medtrans's fiscal 1992 earnings were as represented on the management-prepared unaudited financial statements or would have otherwise induced Blair to proceed with its proposed investment. Indeed, as noted, Medtrans's chief executive officer Roberts testified it was uncertain whether the Blair deal would have consummated if the management-prepared financial statements had been changed as a result of the audit.[18] On this record, whether Blair would have made its proposed investment if Deloitte had followed one of Rossi's assertedly available suggested alternatives was at best speculation.

In sum, Medtrans did not establish Deloitte's alleged breach of contract in not issuing an audit report caused Medtrans any damages. Hence, the portion of the verdict on breach of contract must be reversed.[19]

C

*Erroneous Instruction on Negligent Interference With*
*Prospective Economic Advantage*

 Citing *Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376 [45 Cal.Rptr.2d 436, 902 P.2d 740] (*Della Penna*), defendants

---

[18]We note Medtrans's damages expert Brinig testified he had not expressed any opinion as to damages incurred by Medtrans.

[19]At oral argument defendants' counsel asserted that upon reversal we should direct the superior court to enter a defense judgment due to Medtrans's failure to prove causation. However, we decline to do so in light of the conflicting evidence in the record and the possibility other important facts may be developed at a retrial. (9 Witkin, Cal. Procedure (4th ed. 1977) Appeal, § 763, p. 791.)

contend the trial court prejudicially erred in not instructing the jury on the "independently wrongful" element of the tort of negligent interference with prospective economic advantage.[20] In *Della Penna* the Supreme Court held that ". . . a plaintiff seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful 'by some measure beyond the fact of the interference itself.' " (*Id.* at pp. 392-393.) The Supreme Court also indicated the new rule established by such holding should be applied retroactively since plaintiffs and the legal profession could have fairly foreseen the new rule. (*Id.* at pp. 391-392, fn. 4.) Reviewing the legal issue de novo (*People* v. *Berryman, supra,* 6 Cal.4th at p. 1089), we conclude the court erred in giving a jury instruction omitting the tort's material element of "independent wrongfulness." We further conclude such error prejudiced the defense.

■ Preliminarily, we reject Medtrans's contention that defendants waived, invited or should be estopped to assert any such instructional error by not objecting to the challenged instruction and instead assertedly agreeing to it. We also reject Medtrans's further contention that defendants waived, invited or should be estopped to assert the error by objecting successfully to Medtrans's proposed instructions on defamation. Since the jury instructions on negligent interference with prospective economic advantage made no reference to the tort's "independently wrongful" element, Medtrans's proposed instructions on defamation were irrelevant and potentially confusing to the jury. Further, since *Della Penna* announced a retroactive new rule of law after the verdicts here, the rules of waiver and estoppel relied upon by Medtrans do not necessarily apply. (*Arntz Contracting Co.* v. *St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 476 [54 Cal.Rptr.2d 888]; *In re*

---

[20]The trial court instructed the jury:

"Plaintiffs also seek to recover damages based upon a claim of negligent interference with prospective economic advantage.

"The essential elements of such a claim are:

"1. Economic relationships existed between the plaintiffs and one or more of the following entities, each containing a probable future economic benefit or advantage to plaintiffs: William Blair & Company, AMR, KPMG Peat Marwick, Ernst & Young;

"2. The defendants knew of the existence of these relationships and were aware or should have been aware that if they did not act with due care their actions would interfere with these relationships and cause plaintiffs to lose in whole or in part the probable future economic benefit or advantage of the relationships;

"3. The defendants were negligent, that is, failed to exercise due care; and

"4. The negligence of the defendants caused plaintiffs damage, namely, the relationships were actually interfered with or disrupted and plaintiffs lost in whole or in part the economic benefits or advantages from the relationships."

As noted, the jury found for defendants with respect to third party AMR.

*Marriage of Moschetta* (1994) 25 Cal.App.4th 1218, 1227 [30 Cal.Rptr.2d 893].) Moreover, as discussed, a party harmed by an instruction's incorrect statement of law may assert instructional error on appeal without objecting to the instruction in the trial court or proposing its own correct instruction. (*Agarwal* v. *Johnson, supra,* 25 Cal.3d at pp. 948-949; *Suman* v. *BMW of North America, Inc., supra,* 23 Cal.App.4th at p. 9; Code Civ. Proc., § 647.)

■■■ Medtrans contends the instruction on the elements of negligent interference with prospective economic advantage was proper since the "independently wrongful" element recognized in *Della Penna, supra,* 11 Cal.4th 376, was assertedly limited only to claims where the alleged interference with prospective economic advantage was intentional. However, even before *Della Penna,* appellate courts included the element of independent wrongfulness in analyzing claims for negligent as well as intentional interference with prospective economic advantage. (*Los Angeles Equestrian Center, Inc.* v. *City of Los Angeles* (1993) 17 Cal.App.4th 432, 449 [21 Cal.Rptr.2d 313]; *Bert G. Gianelli Distributing Co.* v. *Beck & Co.* (1985) 172 Cal.App.3d 1020, 1053 [219 Cal.Rptr. 203].) Similarly, we conclude the trial court here should have instructed the jury on the "independently wrongful" element of the tort of negligent interference with prospective economic advantage.

Further, on this record the absence of a proper instruction on the tort's "independently wrongful" element prejudiced defendants. (*Soule* v. *General Motors Corp., supra,* 8 Cal.4th at pp. 570-571, 580-581.) The state of the evidence about defendants' alleged negligent interference with prospective economic advantage "was far from clear or overwhelming." (*Kaljian* v. *Menezes, supra,* 36 Cal.App.4th at p. 589.) Instead, the record contained evidence indicating that defendants' actions with regard to Blair, Ernst & Young and Peat Marwick were not "independently wrongful." Specifically, defendants presented expert testimony that their communications with potential successor auditors Ernst & Young and Peat Marwick about the reasons for resigning from their engagement with Medtrans complied with applicable professional standards requiring open communication with potential successor auditors and were consistent with Medtrans's written authorizations requesting defendants to speak freely with Ernst & Young and Peat Marwick. (1 AICPA Professional Standards, *supra,* at §§ 315, 315.07, 315.09.)[21] Similarly, Peat Marwick's partner testified that defendants communicated the type of information expected from a predecessor

---

[21]Professional standards required defendants to cooperate with Medtrans's attempt to retain a successor accountant by responding "promptly and fully, on the facts known to

auditor. Further, as discussed, Medtrans's expert Rossi did not offer any testimony that defendants acted negligently in a manner other than wrongfully resigning. In sum, the state of the evidence supports a conclusion the jury instruction omitting the "independently wrongful" element of negligent interference with prospective economic advantage was prejudicial. (*Soule* v. *General Motors Corp.*, *supra*, 8 Cal.4th at pp. 570-571, 580-581.)

Further, the prejudice caused by such erroneous jury instruction was not mitigated by other instructions conveying the proper legal standard. (*Soule* v. *General Motors Corp.*, *supra*, 8 Cal.4th at pp. 570-571.) Indeed, there was no other jury instruction specifically defining the element of negligence for purposes of Medtrans's cause of action for negligent interference with prospective economic advantage. Further, the erroneous instruction given to the jury on the tort's elements defined "negligence" only as the failure "to exercise due care." Hence, for further explanation of the meaning of "negligence," the jury had before it the instructions on professional negligence including the instruction on the duration of professional responsibility erroneously indicating that an auditor's resignation was wrongful where unduly jeopardizing the client's interest or occurring before the client had an opportunity to engage a successor auditor. (*Ibid.*) Thus, to the extent based upon Deloitte's assertedly wrongful resignation, the verdict on negligent interference with prospective advantage was tainted by the erroneous instruction on resignation. Moreover, as discussed, Medtrans did not present expert testimony that defendants acted negligently in a manner other than wrongfully resigning. Indeed, Medtrans effectively acknowledges that defendants' resignation constituted the interference with Ernst & Young and Peat Marwick. Thus, the jury's negligent interference verdict lacked sufficient evidentiary support to the extent based on defendants' asserted failures to provide access to working papers and to communicate irregularities, errors or concerns to Medtrans's management. We also reject Medtrans's contention the jury's negligent interference verdict was properly based on defendants' assertedly defamatory statements to successor auditors that defendants could not rely on Medtrans's management's representations. Defamation is

[defendants], to the successor's reasonable inquiries." (1 AICPA Professional Standards, *supra*, at § 315.07.)

Professional standards also provided that a successor auditor "should request the client to authorize the predecessor to allow a review of the predecessor's working papers. It is customary in such circumstances for the predecessor auditor to make himself available to the successor auditor for consultation and to make available for review certain of his working papers. The predecessor and successor auditors should agree on those working papers that are to be made available for review and those that may be copied. Ordinarily, the predecessor should permit the successor to review working papers relating to matters of continuing accounting significance, such as the working paper analysis of balance sheet accounts, both current and noncurrent, and those relating to contingencies. Valid business reasons, however, may lead the predecessor auditor to decide not to allow a review of his working papers." (1 AICPA Professional Standards, *supra*, at § 315.09.)

an intentional tort. In any event, as discussed, the record contained ample evidence that defendants' communications with potential successor auditors about their reasons for resigning from their engagement with Medtrans complied with applicable professional standards requiring open communication with potential successor auditors and were consistent with Medtrans's written authorizations requesting defendants to speak freely with those potential successor auditors. (1 AICPA Professional Standards, *supra*, at §§ 315, 315.07, 315.09.) In sum, the erroneous instruction on negligent interference with prospective advantage resulted in the "entire absence of instructional support" on a material element of the tort and was not remedied by any other instructions. (*Soule* v. *General Motors Corp., supra,* at p. 581.)

Finally, Medtrans's arguments at trial did not remedy the misleading effect of the erroneous instruction on the elements of negligent interference with prospective economic advantage. Medtrans's arguments focused on the alleged effect of defendants' communications on Ernst & Young and Peat Marwick with little discussion of the professional standards requiring resigning auditors to communicate openly with potential successors. (1 AICPA Professional Standards, *supra*, at §§ 315, 315.07, 315.09.) Further, without addressing whether defendants' communications to those potential successor auditors were proper under applicable professional standards, Medtrans's counsel argued to the jury that such communications turned Blair, Ernst & Young and Peat Marwick against Medtrans. Medtrans's counsel also suggested that by merely communicating negative information about their former client Medtrans, defendants rendered such communications wrongful. Those considerations support a conclusion defendants were prejudiced by the erroneous jury instruction's omission of the material element of "independently wrongful." (*Soule* v. *General Motors Corp., supra,* 8 Cal.4th at pp. 570-571, 580-581.)

In sum, based on the factors discussed above, the erroneous jury instruction on the elements of negligent interference with prospective economic advantage must be considered prejudicial. It is reasonably likely that the verdict favoring Medtrans on its claim for negligent interference was based upon such erroneous instruction. (*Soule* v. *General Motors Corp., supra,* 8 Cal.4th at pp. 570-571; *Mattco Forge, Inc.* v. *Arthur Young & Co., supra,* 52 Cal.App.4th at pp. 842-843; *Bay Summit Community Assn.* v. *Shell Oil Co., supra,* 51 Cal.App.4th at p. 778.) Hence, since tainted by the erroneous instruction, the portion of the verdict on negligent interference with prospective economic advantage must be reversed.

## V

### Disposition

The judgment is reversed. Appellants are awarded costs on appeal.

Benke, J., and Haller, J., concurred.